IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re | § | CASE NO. 16-31521 |
| | § | |
| Tristream East Texas, LLC, | § | Chapter 11 |
| | § | |
| Debtor. | § | Judge David R. Jones |
| | § | |

### DEBTOR'S EMERGENCY MOTION TO APPROVE (1) MAINTENANCE OF PRE-PETITION BANK ACCOUNTS AND (2) CONTINUED USE OF EXISTING CHECKS AND BUSINESS FORMS

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Tristream East Texas, LLC ("**Debtor**" or "**East Texas**"), debtor and debtor-in-possession, files this Emergency Motion to (1) Approve Maintenance of Pre-Petition Bank Accounts and (2) Continue Use of Existing Checks and Business Forms (the "**Motion**") and respectfully submits the following:

### I. JURISDICTION AND PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. On March 30, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing the above-captioned bankruptcy case (the "**Case**").

4. Since the Petition Date, the Debtor has continued to operate and manage its business as debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5. As of the date hereof, an official committee of unsecured creditors has not been appointed in the Case.

### II. EMERGENCY CONSIDERATION

6. The Debtor requests emergency consideration of this Motion. The Debtor believes an immediate and orderly transition into chapter 11 is critical to the viability of its operations. Any delay in granting the relief requested could hinder the Debtor's operations and cause irreparable harm. As such, the Debtor believes that emergency consideration is necessary and requests that this Motion be heard at the Debtor's First Day Hearings.

### III.  STATEMENT OF FACTS

#### A.  Business Overview

7. The Debtor is a wholly owned subsidiary of Tristream Energy, LLC, a Delaware limited liability company ("**Parent**"). The Debtor is a midstream operating company that provides gas gathering and processing services to producers from facilities in East Texas. The Debtor processes, treats and sells natural gas, natural gas liquids, condensate and sulfur, with special technical expertise in handling gas streams with impurities like carbon dioxide, nitrogen and hydrogen sulfide. The Debtor's capabilities include natural gas gathering with over 400 miles of natural gas gathering pipelines, cryogenic processing, acid gas treating, sulfur recovery and condensate treating and stabilization. The Debtor's unique combination of midstream assets is capable of processing non-marketable natural gas, and of treating/stabilizing a wide range of off-spec condensate and natural gas liquids including sour water stripping and waste water disposal systems. The Debtor owns and operates a gas processing and treating facility in Eustace, Henderson County, Texas, that is connected to the Atmos pipeline system and a condensate stabilization and treatment facility in Myrtle Springs, Van Zandt County, Texas, just off Interstate 20. Its operations span Henderson, Van Zandt, Rains, Wood, Hopkins, and Franklin Counties in East Texas. The Debtor directly employs fifty-five (55) employees (the "**Employees**").

8. The Debtor's headquarters are located in Houston, Texas, together with those of its Parent. Parent manages the administrative and corporate affairs of the Debtor via a Management Services Agreement (the "**MSA**"). Under the MSA, Parent employs and pays, on the Debtor's behalf, the salaries of twelve (12) individuals including Debtor's executive officers, upper management, and support staff; pays the Debtor's rent obligations; and administers all of the

Debtor's employee benefit plans including health, dental and vision insurance; life insurance; short term and long term disability insurance; 401(k); and vacation/paid time off benefit programs.[1]

### B. Prepetition Secured Debt

9. On July 15, 2010, the Debtor, as Borrower, entered into a Senior Secured Reducing Revolving Credit Facility with Amegy Bank, N.A. ("**Amegy**")[2], as lender and administrative agent, which was subsequently amended by a First Amendment to Credit Agreement dated November 23, 2010, a Second Amendment to Credit Agreement dated April 3, 2012, a Third Amendment to Credit Agreement dated April 26, 2012, a Fourth Amendment to Credit Agreement dated August 17, 2012, a Fifth Amendment to Credit Agreement dated December 21, 2012, a Sixth Amendment to Credit Agreement dated May 21, 2013, a Seventh Amendment to Credit Agreement dated June 30, 2014, an Eighth Amendment to Credit Agreement dated January 15, 2015, a Ninth Amendment to Credit Agreement dated May 17, 2015 and a Tenth Amendment to the Credit Agreement dated October 19, 2015 (the "**Prepetition Credit Facility**"). In connection with and pursuant to the Prepetition Credit Facility, the Debtor executed a promissory note in the face amount of $30 million. The current amount outstanding under the Prepetition Credit Facility is approximately $18.6 million.

10. Incident to the Prepetition Credit Facility, the Debtor and Amegy also executed (i) certain Deeds of Trust under which Amegy asserts a lien on the real property and fixtures described therein (the "**Real Property Collateral**") and the personal property described therein, and the Debtor, Amegy and the Debtor's Parent executed (ii) a Pledge and Security Agreement

---

[1] A Motion to Assume the MSA is filed contemporaneously herewith.
[2] Amegy Bank of Texas, N.A. is an approved depository listed on the U.S. Trustee's Southern/Western Districts of Texas List of Approved Depositories As of July 2014.

dated July 15, 2010, in favor of Amegy as Administrative Agent purportedly granting a security interest in Debtor's and Parent's personal property described therein (the **"Personal Property Collateral"**. The Real Property Collateral and the Personal Property Collateral are collectively referred to as the **"Prepetition Collateral"**). Pursuant to the referenced agreements, Amegy asserts a security interest and lien upon substantially all of the assets of the Debtor, including Debtor's inventory, accounts receivable, equipment, general intangibles, and "cash collateral" as defined in section 363(a) of the Bankruptcy Code. To the best of Debtor's knowledge, no other creditor asserts an interest in Debtor's cash collateral.

11.     Further, on July 15, 2010, Parent executed a Guaranty in favor of Amegy as Administrative Agent purportedly guarantying Debtor's obligations under the Prepetition Credit Facility.

12.     On October 19, 2015, Amegy, as seller, and Haddington Energy Partners, IV (**"Haddington"**), the owner of a majority of the Debtor's class C equity, as purchaser, entered into a Loan Purchase and Sale Agreement[3] under which Haddington agreed that, if one of the following events does not occur on or prior to September 30, 2016, then Haddington will purchase from Amegy all of Amegy's right, title and interest in the loan to the Debtor/Borrower made pursuant to the Prepetition Credit Facility: (i) any person, entity or group acquires, directly or indirectly, the beneficial ownership of more than fifty-one percent (51%) of the total voting power of the outstanding voting equities of the Parent or Borrower, (ii) upon the merger or consolidation of the Parent or Borrower with any other entity other than a merger or consolidation which would result

---

[3] Capitalized terms not otherwise defined in this motion are defined in the Loan Purchase and Sale Agreement.

in more than fifty-one percent (51%) of the total voting power represented by the voting securities of the surviving entity outstanding after such transaction being beneficially owned by Haddington or its Affiliates or (iii) the sale of all or substantially all of the assets of the Parent or Borrower[.]" At this time, the Debtor does not anticipate that any of the above events will occur on or before September 30, 2016. Thus, it is anticipated that Haddington's purchase obligation will mature and Haddington will ultimately replace Amegy as the Debtor's senior secured creditor.

C. **Events Leading to Chapter 11**

13. A confluence of factors in 2014 and 2015 led to the Debtor's need to pursue a financial restructuring. Primary among those factors has been the historic decline in the price of natural gas since the summer of 2014. First of all, notwithstanding the falling price of these commodities, the Debtor's costs to gather and process same have not likewise declined, and, secondly, the sheer amount of gas that producers send to the Debtor for those processing services has precipitously declined. In order for the Debtor's facilities to operate at a level that make it economically feasible to continue operations, the Debtor would need to gather and process over double the amount of gas than is currently flowing into its facilities. In short, the Debtor's revenue and cash flow from operations has been adversely affected to the point that the Debtor will lose approximately $1 million per month for each and every month that the plant remains operational. The Debtor is therefore currently contemplating placing the plants into a "warm idling" mode where the integrity of the pipeline and actual machinery at the facilities is maintained, but operations otherwise cease unless and until economic conditions merit a return to fully operational mode. In the interim, the Debtor's liquidity has been impaired to such an extent that the Debtor is compelled

to seek a restructuring of its liabilities in order to maximize the value of its assets for the benefit of creditors and other constituencies.

### IV. THE DEBTOR'S BANK ACCOUNTS

14. In summary, prior to commencing the Case, the Debtor managed its cash, receivables, and payables through a single operating account at Amegy, Account No. XXXX8268 (the "**Operating Account**"), with the goal being the efficient collection, transfer, and disbursement of funds from one centralized account. Additionally, and as a requirement from the inception of doing business with Amegy, the Debtor maintains a money market account containing approximately $2,000.00, Account No. XXXX8306 (the "**Money Market Account**") (together, the "**Bank Accounts**").

15. The Money Market Account contains approximately $2,000.00 in deposits. This account is not utilized for any payments or receipts, and the Debtor intends to close this account and deposit the funds therein into the Operating Account.

16. The Operating Account is utilized for:

    a. Receipt of payments of accounts receivable;

    b. Payments for accounts payable to vendors;

    c. To fund employee payroll to third party payroll processing vendor;

    d. To fund payments due under the Master Service Agreement ("**MSA**") with Tristream Energy, LLC;

    e. To fund payment of the twenty-five (25) Amegy P-Cards (as defined below) held by the Debtor's employees; and

    f. To fund any payments that may be due under loan agreement with Amegy Bank of Texas.

17. A deposit account control agreement with Amegy has been entered into with respect to the Operating Account, and the Operating Account is pledged to Amegy under the Prepetition Credit Facility. In the ordinary course of business, Amegy will debit or sweep the Operating Account for a number of fees and expenses related to the cost of administering such account, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "**Bank Fees**"). The Bank Fees are either debited directly from the Operating Account or are paid in connection with wire transfers.

18. Amegy has issued twenty-five (25) procurement cards (the "**P-Cards**") to the Debtor that are used in the ordinary course of business to purchase supplies, materials, goods and services incident to the Debtor's everyday business operations. Payment for amounts due on the P-Cards is initiated by the Debtor and then drafted by Amegy from the Operating Account on a monthly basis.

## V.   RELIEF REQUESTED

19. The nature of the Debtor's business makes it critical that the Operating Account be maintained for the duration of the Case. Disruption of the Operating Account would have a negative impact not only on the debtor's ability to pay its ordinary course of business obligations to vendors critical to its operations, and would disrupt payments coming in on accounts receivable, as well as payroll to the Debtor's fifty-five (55) employees. Accordingly, the Debtor seeks entry of an order, subject to any order authorizing the use of the Debtor's cash collateral: (a) authorizing the Debtor to maintain its existing Operating Account and waiving certain requirements of Rule 7(B) of the Complex Chapter 11 Guidelines (defined below); (b) authorizing the Debtor to continue its use of the current business forms and checks for the Operating Account; (c) authorizing the Debtor to pay any undisputed pre-petition Bank Fees and continue to pay any Bank Fees in the ordinary course of

business; (d) authorizing the Debtor to pay any undisputed pre-petition amounts due on the P-Cards and continue payment of P-Card amounts in the ordinary course of business; and (e) waiving the requirement to comply with Bankruptcy Code § 345, to the extent, if any, that the Debtor's Operating Account does not strictly comply therewith.

20. The Debtor also respectfully requests that the Court authorize and direct Amegy to maintain, service, and administer the Operating Account without interruption and in the ordinary course of business. In this regard, the Debtor requests the bank be authorized and directed to receive, honor, and pay any and all checks, wire transfers, automatic clearinghouse payments, and other instructions, and drafts payable through, drawn, or directed on the Operating Account after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

### A. *Continued Use of Existing Operating Account*

21. Pursuant to Bankruptcy Code §§ 105 and 363, the Debtor requests, *inter alia*, (a) authority to continue the use of its existing Operating Account and, incident thereto, (b) a partial waiver of Rule 7(B) of the *Procedures for Complex Chapter 11 Bankruptcy Case for the United States Bankruptcy Court for the Southern District of Texas*, available at http://www.txs.uscourts.gov/sites/txs/files/complex_rules.pdf (the "**Complex Chapter 11 Guidelines**").

22. In order to supervise the administration of chapter 11 cases, the Office of the United States Trustee ("**UST**") has established certain operating guidelines (the "**UST Guidelines**") for debtor-in-possession. *See Guidelines for Debtor-in-Possession*, U.S. Department of Justice, United States Trustee Program, Region 7, *available at* http://www.justice.gov/sites/default/files/ust-regions/legacy/2011/07/13/DIP_Guidelines.pdf.

23. The UST Guidelines generally require a chapter 11 debtor to, *inter alia*:

    (a)    close all existing bank accounts;

    (b)    open new bank accounts in a depository approved by the UST that are designated as debtor in possession accounts, with separate debtor in possession accounts established for an operating account, a tax account (to the extent that payroll or other taxes are an issue for the debtor), and a payroll account (to the extent that the debtor had a separate payroll account pre-petition);

    (c)    obtain and utilize new checks for all debtor in possession accounts that bear the designation "Debtor in Possession" and contain other information about the chapter 11 case and ensure that the signature cards for all debtor in possession accounts clearly indicate that the debtor is a debtor in possession;

    (d)    deposit all receipts and make all disbursements only though the approved debtor in possession accounts, with any funds in excess of those required for current operations being maintained in an interest-bearing account;

    (e)    deposit to the tax debtor in possession account sufficient funds to pay any tax liability (when incurred) associated with the debtor's payroll; and

    (f)    deposit all estate funds into an account with a financial institution that agrees to comply with the requirements of the UST and is an authorized depository approved by the UST.

*Id* at §§ A-F.

24. Requiring the Debtor to adopt a new cash management system and open new bank account(s) at the same or a different depositary institution at this early and critical stage of the case would be expensive, impose needless administrative burdens on the Debtor, and would cause undue disruption to the Debtor's operations. Any such disruption would affect the Debtor's ability to maximize estate values for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary insofar as the Debtor's Operating Account is located at an approved depository for the Southern District, and its continued use provides a safe, efficient, and established means for the Debtor to maintain and manage its cash.

25. The Debtor submits that a waiver of certain of the requirements of the UST Guidelines and Complex Chapter 11 Guidelines is appropriate in this case because maintenance of the Debtor's existing Operating Account will minimize the disruption to the Debtor's operations and promote an orderly and efficient transition into chapter 11 and is entirely consistent with the goals underlying the UST Guidelines. Use of the Operating Account constitutes an ordinary course and essential business practice and provides significant benefits to the Debtor and its estate including, *inter alia*, the ability to: (a) centralize and control corporate funds, (b) ensure the maximum availability of funds when necessary, and (c) reduce borrowing costs and administrative expenses by facilitating the movement of funds and by providing more timely and accurate account balance information.

26. Accordingly, the Debtor requests authority to: (a) maintain and continue to use its existing Operating Account in the name and with the existing account number, provided that the Debtor reserves the right to close its existing Bank Accounts and open new debtor in possession accounts; (b) deposit funds in and withdraw funds from the Operating Account by all usual means, including checks, wire transfers, automatic clearinghouse transfers, electronic funds transfers, or other debits; and (c) treat its existing Operating Account (and any accounts opened post-petition) for all purposes as debtor in possession accounts.

27. As set forth above, to ensure that all transfers and transactions will be documented in its books and records, the Debtor will continue to maintain records of all deposits into and transfers out of the Operating Account.

28. Bankruptcy courts in the Fifth Circuit have routinely granted authority for a debtor's continued use of its existing accounts, cash management procedures and policies, particularly where

the entities involved form a large and complex organization. *See e.g., In re ASARCO LLC,* No. 05-21207, Docket No. 52 (Bankr. S.D. Tex. Aug. 12, 2005); *In re ATP Oil & Gas Corp.*, No. 12-36187, Docket No. 135 (Bankr. S.D. Tex. Aug. 22, 2012); *In re Autoseis, Inc., et al.*, No. 14-20130, Docket No. 247 (Bankr. S.D. Tex. Apr. 25, 2014); *In re Buccaneer Res. LLC, et al.*, No. 14-60041, Docket No. 118 (Bankr. S.D. Tex. June 4, 2014); *In re Univ. Gen. Health Sys., Inc., et al.*, No. 15-31086, Docket No. 146 (Bankr. S.D. Tex. Mar. 23, 2015).

29. The uninterrupted maintenance of the Operating Account will accomplish the dual goals of minimizing the disruption to the Debtor's operations and satisfying the UST Guidelines. The recording of all transactions in the Operating Account will afford a complete accounting of the Debtor's funds and will provide the UST comfort that the spirit of the UST Guidelines are being observed.

## B. Waiver of Requirement Regarding Checks, Business Forms, and Signature Cards

30. The Debtor seeks a waiver of the requirement to immediately purchase new checks and business forms that include the term "debtor in possession" and the case number assigned to the case. Initially, the Debtor has an inventory of check stock and business forms for the Operating Account ("**Business Forms**") that would go to waste if new checks were to be ordered and used. Secondly, as discussed in this and other first day motions, the Debtor anticipates an imminent ramp-down to a "warm" idle mode at its facilities and, once same is accomplished, will require limited use of checks and other business forms. Thus, requiring the Debtor to obtain new checks for the Operating Account which bear the designation "debtor in possession" but may never actually be used, would cause the Debtor to incur undue expense. Accordingly, to preserve funds and assist in the efficient administration of the estates, the Debtor seeks authority to use pre-existing business

forms and check stock with respect to the Operating Account. Finally, the Debtor seeks authority to maintain its existing signature card on the Operating Account with the addition of the DIP designation.

### C. Waiver of Compliance with 11 U.S.C. § 345

31.   The Debtor further seeks a waiver of the requirement to comply with Bankruptcy Code § 345, to the extent, if any, the Debtor's Operating Account does not strictly comply therewith. Bankruptcy Code § 345(a) provides that "[a] trustee in a case under this title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable return on such money, taking into account the safety of such deposit." 11 U.S.C. § 345(a). Bankruptcy Code § 345(b) further provides that unless the Court orders otherwise, for deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require the institution with which the money is deposited or invested to either post a surety bond or deposit "securities of the kind specified in section 9303 of title 31." 11 U.S.C. § 345(b).

32.   Bankruptcy courts in the Fifth Circuit have authorized debtors to continue their pre-petition investment policies without requiring strict compliance with Bankruptcy Code § 345(b). *See, e.g., In re ASARCO LLC,* No. 05-21207, Docket No. 52 (Bankr. S.D. Tex. Aug. 12, 2005); *In re ATP Oil & Gas Corp.*, No. 12-36187, Docket No. 135 (Bankr. S.D. Tex. Aug. 22, 2012); *In re Univ. Gen. Health Sys., Inc., et al.*, No. 15-31086, Docket No. 146 (Bankr. S.D. Tex. Mar. 23, 2015). The Debtor has no reason to believe at this time that its Operating Account does not comply with Bankruptcy Code § 345. Nevertheless, to the extent that same does not comply strictly, the

Debtor submits that cause exists to waive any such noncompliance because all funds are deposited safely and prudently at Amegy, a financially stable banking institution approved for use by debtors-in-possession in the Southern District.

## VI.   NOTICE

33. Notice of this Motion has been provided by e-mail, facsimile, and/or overnight delivery to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) Amegy; (c) counsel to Amegy; (d) the Debtor's 20 largest unsecured creditors; (e) any creditors holding secured claims against the Debtor in excess of $1 million; and (f) those persons who have formally appeared in the Case and requested service pursuant to Bankruptcy Rule 2002. Upon the entry of the proposed order setting an expedited hearing on this and other first day motions, notice of said hearing will additionally be provided to each of the above-referenced parties.

## VII.   PRAYER

The Debtor respectfully requests that the Court enter an order:

(a)   authorizing the Debtor, subject to any order governing the use of the Debtor's cash collateral, to maintain and continue to use its Operating Account in the ordinary course of business in its business judgment, including authorizing the Debtor to continue to pay the Bank Fees associated with Amegy's maintenance of the Operating Account in the ordinary course of business;

(b)   authorizing the Debtor to pay any undisputed pre-petition amounts due on the P-Cards and continue payment of P-Card amounts from the Operating Account in the ordinary course of business;

(c) authorizing the Debtor to utilize its existing checks and business forms for the Operating Account and maintain its existing signature card with the addition of a DIP designation;

(d) waiving the requirement to comply with Bankruptcy Code § 345, to the extent, if any, the Operating Account does not strictly comply therewith and Rule 7(B) of the Complex Chapter 11 Guidelines;

(e) authorizing and directing the Debtor's bank to maintain, service, and administer the Debtor's Operating Account without interruption and in the ordinary course of business, and receive, honor, and pay any and all checks, wire transfers, automatic clearinghouse payments, and other instructions, and drafts payable through, drawn, or directed on such account after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; and

(f) granting such other and further relief, both at law and in equity, as this Court deems just and proper.

Dated: March 31, 2016

Respectfully submitted,

**COATS ROSE, P.C.**

By:    */s/ Frank J. Wright*
         Frank J. Wright
         Texas State Bar No. 22028800
         C. Ashley Ellis
         Texas State Bar No. 00794824
         Erin C. McGee
         Texas State Bar No. 24055937

600 Signature Place
14755 Preston Road
Dallas, Texas 75254
(972) 788-1600
(972) 239-0138 – fax
bankruptcy@coatsrose.com

**PROPOSED COUNSEL FOR**
**TRISTREAM EAST TEXAS, LLC**

## CERTIFICATE OF CONFERENCE

I certify that on March 31, 2016, I spoke with Mr. Hector Duran of the Office of the United States Trustee for the Southern District. In that conversation, I was advised that, subject to appropriate "DIP" designation on the signature card for the Operating Account, Mr. Duran did not oppose the relief requested herein.

                */s/ C. Ashley Ellis*
                C. Ashley Ellis

## CERTIFICATE OF SERVICE

I certify that on March 31, 2016, a true and correct copy of the above and foregoing document was served either via the *ECF system* of the Bankruptcy Court, facsimile, electronic mail, overnight courier, and/or first class United States mail, postage prepaid on each of the parties listed on the attached mailing list.

*/s/ C. Ashley Ellis*
C. Ashley Ellis

4821-2844-8047, v. 1

## MAILING LIST

Mark A. Serice  
Amegy Bank  
4400 Post Oak Parkway  
Houston, TX 77027  

Robert C. Shearer  
Thompson & Knight, LLP  
333 Clay St., Suite 3300  
Houston, TX 77002  

U.S. Trustee  
515 Rusk Street  
Suite 3516  
Houston, TX 77002  

Texas Comptroller of Public Accounts  
P.O. Box 135280  
Austin, TX 78711-3528  

Internal Revenue Service  
P.O. Box 21226  
Philadelphia, PA 19114  

Attorney General of Texas  
Taxation Division - Bankruptcy  
P.O. Box 12548  
Austin, TX 78711  

## 20 LARGEST UNSECURED CREDITORS

Eagle Rock Acquisition Partnership  
Attn: Trish Foremean  
P.O. Box 2968  
Houston, TX 77252-2968  

Thermo Control, Inc.  
Attn: Edgar Franco  
P.O. Box 1102  
Mount Pleasant, TX 75456-1102  

EMS USA, Inc.  
Dept. 9296  
Attn: Chris Hoffman  
P.O. Box 4346  
Houston, TX 77210  

Hy-Tech Insulation, Inc.  
Attn: Keith Freeman  
P.O. Box 2084  
Kilgore, TX 75663  

Targa Resources Partners LP  
Attn: AR Dept.  
110 W. 7th St., Suite 2300  
Tulsa, OK 74119  

Utility Rebate Consultants, Inv.  
Attn: Dan Mailath  
2526 East 71st St., Suite E  
Tulsa, OK 74136-5531  

Sabre Operating, Inc.  
Attn: Denise Field  
P.O. Box 4848  
Wichita Falls, TX 76308-0848  

In2Tex3 LP  
Attn: Jason Bradley  
4908 Costa De Oro Ct.  
Arlington, TX 76017  

Louisiana Valve Source, Inc.  
Attn: Thomas Davidson  
P.O. Box 932276  
Atlanta, GA 31193-2276  

Noblett Electric Motor Service  
Attn: Mark Noblett  
P.O. Box 3097  
Corsicana, TX 75110

NALCO Champion  
Attn: Monica Brock  
P.O. Box 73005  
Dallas, TX 75373-0005  

Western Marketing, Inc.  
Attn: Jess Martin  
P.O. Box 677422  
Dallas, TX 75267  

Basic Energy Services, LP  
Attn: Clint Trewin  
P.O. Box 841903  
Dallas, TX 75284  

Nordon Corporation  
Attn: Norman Franco  
P.O. Box 1415  
Round Rock, TX 78680  

SAMCO Enterprises, Inc.  
Attn: Kandie Epps  
3326 FM 2767  
Tyler, TX 75708  

Johnny Ray Clements  
185 Cedar Oaks Drive  
Mabank, TX 75156  

DPC Industries, Inc.  
Attn: Jimmy Tidwell  
P.O. Box 301023  
Dallas, TX 75303-1023  

John Crane Inc.  
Attn: Gary Collier  
24929 Network Place  
Chicago, IL 60673-1249  

Diversified Projects, Inc.  
Attn: Bob Coley  
25000 Pitkin Road  
Suite 270  
Spring, TX 77386  

Univar USA Inc.  
Attn: AR Dept.  
P.O. Box 849027  
Dallas, TX 75284-9027