## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re | § | **CASE NO. 16-31521** |
| | § | |
| **TRISTREAM EAST TEXAS, LLC,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | **Judge David R. Jones** |
| | § | |
| | § | |
| | § | |
| | § | |

### DECLARATION OF GENE WAGUESPACK, SENIOR VICE PRESIDENT
### AND CHIEF FINANCIAL OFFICER OF TRISTREAM ENERGY, LLC,
### IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, Gene Waguespack, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge and belief:

1.      I am Senior Vice President and Chief Financial Officer of Tristream East Texas, LLC ("**Debtor**") and its parent company, Tristream Energy, LLC ("**Parent**"). I manage the day-to-day operations of Debtor and Parent. I am a Certified Public Accountant in the State of Texas and have held various executive management positions in accounting and finance. I have been employed as CFO of the Debtor and Parent as of December, 2014.

2.      On March 30, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. To help minimize the impact of this filing on its business operations, the Debtor also filed certain motions and pleadings seeking various types of "first day" relief (collectively, the "**First Day Pleadings**") intended to allow the Debtor to perform and meet some of the obligations necessary to fulfill its duties as debtor in possession. I am familiar with the contents of each First Day Pleading and believe that

the relief sought in each First Day Pleading (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption and loss of value to the Debtor's estate, (b) is critical to achieving a successful outcome for the Debtor, and (c) best serves the interests of all stakeholders. The description of the relief requested and the facts supporting each of the First Day Pleadings is attached hereto as Exhibit "A" and incorporated herein by reference as part of my declaration.

3.      I submit this declaration (this **"Declaration"**) to provide an overview of the Debtor, its business, assets and liabilities, and the reasons for commencing this chapter 11 case, as well as to support the Debtor's chapter 11 petitions and First Day Pleadings. Unless otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by members of the Debtor's management and the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's assets, liabilities, operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.   BACKGROUND

4.      The Debtor, Tristream East Texas, LLC, is a wholly owned subsidiary of Tristream Energy, LLC, a Delaware limited liability company. Parent's corporate office and principal place of business is located at 10370 Richmond Avenue, Suite 400, Houston, Texas 77042. The Debtor is a midstream operating company that provides gas gathering and processing services to producers from facilities in East Texas. The Debtor processes, treats and sells natural

gas, natural gas liquids, condensate and sulfur, with special technical expertise in handling gas streams with impurities like carbon dioxide, nitrogen and hydrogen sulfide. The Debtor's capabilities include natural gas gathering with over 400 miles of natural gas gathering pipelines, cryogenic processing, acid gas treating, sulfur recovery and condensate treating and stabilization. The Debtor's unique combination of midstream assets is capable of processing non-marketable natural gas, and of treating/stabilizing a wide range of off-spec condensate and natural gas liquids including sour water stripping and waste water disposal systems.

5.    The Debtor owns and operates a gas processing and treating facility in Eustace, Henderson County, Texas, that is connected to the Atmos pipeline system, a condensate stabilization and treatment facility in Myrtle Springs, Van Zandt County, Texas, just off Interstate-20, and its operations span Henderson, Van Zandt, Rains, Wood, Hopkins, and Franklin Counties in East Texas. The Debtor directly employs fifty-five (55) employees.

6.    Parent manages the administrative and corporate affairs of the Debtor via a Management Services Agreement (the "**MSA**"). Under the MSA, Parent employs and pays the salaries of twelve (12) individuals including Debtor's executive officers, upper management, and support staff; pays the Debtor's rent obligations; and administers all of the Debtor's employee benefit plans including health, dental and vision insurance; life insurance; short term and long term disability insurance; 401(k); and vacation/paid time off benefit programs.

## II.    EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE

7.    A confluence of factors in 2014 and 2015 led to the Debtor's need to pursue a financial restructuring. Primary among those factors has been the historic decline in the price of natural gas, also condensate natural gas liquids and sulfur since the summer of 2014.

8.      First of all, notwithstanding the falling price of these commodities, the Debtor's costs to gather and process that gas and associated commodities have not likewise declined, and, secondly, the sheer amount of gas that producers send to the Debtor for processing services has precipitously declined. In order for the Debtor's facilities to operate at a level that make it economically feasible to continue operations, the Debtor would need to gather and process over double the amount of gas that is currently flowing into its facilities.

9.      In short, the Debtor's revenue and cash flow from operations has been adversely affected to the point that the Debtor will lose approximately $1 million per month for each and every month that the plant remains operational. The Debtor is therefore currently contemplating placing the plants into a "warm idling" mode where the integrity of the pipeline and actual machinery at the facilities is maintained, but operations otherwise cease unless and until economic conditions merit a return to fully operational mode. In the interim, the Debtor's liquidity has been impaired to such an extent that the Debtor is compelled to seek a restructuring of its liabilities in order to maximize the value of its assets for the benefit of creditors and other constituencies.

### III.   PREPETITION RESTRUCTURING EFFORTS AND DEBTOR IN POSSESSION FINANCING

10.      On July 15, 2010, the Debtor, as Borrower, entered into a Senior Secured Reducing Revolving Credit Facility with Amegy Bank, N.A. (**"Amegy"**), as lender and administrative agent, which was subsequently amended by a First Amendment to Credit Agreement dated November 23, 2010, a Second Amendment to Credit Agreement dated April 3, 2012, a Third Amendment to Credit Agreement dated April 26, 2012, a Fourth Amendment

to Credit Agreement dated August 17, 2012, a Fifth Amendment to Credit Agreement dated December 21, 2012, a Sixth Amendment to Credit Agreement dated May 21, 2013, a Seventh Amendment to Credit Agreement dated June 30, 2014, an Eighth Amendment to Credit Agreement dated January 15, 2015, a Ninth Amendment to Credit Agreement dated March 17, 2015 and a Tenth Amendment to the Credit Agreement dated October 19, 2015 (the **"Prepetition Credit Facility"**). In connection with and pursuant to the Prepetition Credit Facility, the Debtor executed a promissory note in the face amount of $30 million. The current amount outstanding under the Prepetition Credit Facility is approximately $18.6 million.

11.     Incident to the Prepetition Credit Facility, the Debtor and Amegy also executed (i) certain Deeds of Trust under which Amegy asserts a lien on the real property and fixtures described therein (the "**Real Property Collateral**") and the personal property described therein, and the Debtor, Amegy and the Debtor's Parent executed (ii) a Pledge and Security Agreement dated July 15, 2010, in favor of Amegy as Administrative Agent purportedly granting a security interest in Debtor's and Parent's personal property described therein (the **"Personal Property Collateral"**. The Real Property Collateral and the Personal Property Collateral are collectively referred to as the **"Prepetition Collateral"**). Pursuant to the referenced agreements, Amegy asserts a security interest and lien upon substantially all of the assets of the Debtor, including Debtor's inventory, accounts receivable, equipment, general intangibles, and "cash collateral" as defined in section 363(a) of the Bankruptcy Code. To the best of Debtor's knowledge, no other creditor asserts an interest in Debtor's cash collateral.

12.     Further, on July 15, 2010, Parent executed a Guaranty in favor of Amegy as Administrative Agent purportedly guarantying Debtor's obligations under the Prepetition Credit Facility.

13.     On October 19, 2015, Amegy, as seller, and Haddington Energy Partners, IV (**"Haddington"**), the owner of a majority of the Debtor's class C equity, as purchaser, entered into a Loan Purchase and Sale Agreement[1] under which Haddington agreed that, if one of the following events does not occur on or prior to September 30, 2016, then Haddington will purchase from Amegy all of Amegy's right, title and interest in the loan to the Debtor/Borrower made pursuant to the Prepetition Credit Facility: (i) any person, entity or group acquires, directly or indirectly, the beneficial ownership of more than fifty-one percent (51%) of the total voting power of the outstanding voting equities of the Parent or Borrower, (ii) upon the merger or consolidation of the Parent or Borrower with any other entity other than a merger or consolidation which would result in more than fifty-one percent (51%) of the total voting power represented by the voting  securities of the surviving entity outstanding after such transaction being beneficially owned by Haddington or its Affiliates or (iii) the sale of all or substantially all of the assets of the Parent or Borrower[.]" At this time, the Debtor does not anticipate that any of the above events will occur on or before September 30, 2016. Thus, it is anticipated that Haddington's purchase obligation will mature and Haddington will ultimately replace Amegy as the Debtor's senior secured creditor.

---

[1] Capitalized terms not otherwise defined in this motion are defined in the Loan Purchase and Sale Agreement.

14.     In addition to the debt with Amegy Bank N.A., the Debtor has debt to unsecured creditors totaling in excess of $2.8 million in addition to amounts owed in connection with purchaser contracts.


April 4, 2016                         /s/ Gene Waguespack
Date                                 Senior Vice President and
                                     Chief Financial Officer
                                     Tristream East Texas, LLC

## FACTUAL BACKGROUND IN SUPPORT
## OF THE DEBTOR'S FIRST DAY MOTIONS

### First Day Pleadings

**A.**    **Debtor's Emergency Motion for Interim and Final Orders (1) Authorizing Use of Cash Collateral and Granting Adequate Protection, (2) Authorizing Postpetition Financing, and (3) Granting Related Relief ("Financing Motion")**

1.      Haddington has agreed to provide the Debtor with junior secured postpetition financing which if approved on a final basis would consist of a revolving credit facility for up to $8,000,000.00 (the "DIP Facility"). The Debtor has an immediate need for the use of Cash Collateral and postpetition financing via the DIP Facility to continue the operation of its business. Without such funds, the Debtor will be unable to pay costs and expenses, including, but not limited to, wages, salaries, professional fees, general and administrative expenses and maintenance costs that arise in connection with the administration of these chapter 11 cases and in the ordinary course of the Debtor's business.

2.      The Debtor has prepared a budget of the anticipated costs of operations for the first four (4) weeks of the Chapter 11 proceeding on a weekly basis. As noted above, a copy of this four-week forecast is attached as **Exhibit A** to the Financing Motion (the **"Interim Budget"**). The Interim Budget is a projection and is subject to change depending on the amount of credit obtained from vendors, and the level of continued receipts of payments from third-party payors. This Interim Budget reflects, among other things, anticipated receipts, anticipated disbursements and cash on hand, and will be revised on an on-going basis. The Cash Collateral expended will be used in accordance with the Budget for ordinary course business expenses noted thereon including payroll, utilities, freight and shipping costs, raw materials, payments

due under the Management Services Agreement, and reorganization expenses in amounts not to exceed by more than 10% the aggregate expenses provided in the Budget.

3.      Absent approval of the DIP Motion, I believe the Debtor lacks sufficient funds to continue operating. I believe the DIP Credit Facility, as reviewed and defined in the DIP Motion, reasonably addresses the Debtor's financing requirements and constitutes the best financing option available to the Debtor given the circumstances of its business, its capital structure, and this chapter 11 case. I also believe the terms of the DIP Facility are fair and reasonable and represent the best financing available in the marketplace under the circumstances. If the Court does not grant the relief requested in the DIP Motion, the Debtor will be forced to shut down its operations to the detriment of the value of its assets and all stakeholders.

**B.      Debtor's Emergency Motion to Approve (1) Maintenance of Prepetition Bank Accounts and (2) Continued Use of Existing Checks and Business Forms**

4.      In summary, prior to commencing the Case, the Debtor managed its cash, receivables, and payables through a single operating account at Amegy, Account No. XXXX8268 (the **"Operating Account"**), with the goal being the efficient collection, transfer, and disbursement of funds from one centralized account. Additionally, and as a requirement from the inception of doing business with Amegy, the Debtor maintains a money market account containing approximately $2,000.00, Account No. XXXX8306 (the **"Money Market Account"**) (together, the **"Bank Accounts"**).

5.      The Money Market Account contains approximately $2,000.00 in deposits. This account is not utilized for any payments or receipts, and the Debtor intends to close this account and deposit the funds therein into the Operating Account.

6.      The Operating Account is utilized for:

     a.      Receipt of payments of accounts receivable;

     b.      Payments for accounts payable to vendors;

     c.      To fund employee payroll to third party payroll processing vendor;

     d.      To fund payments due under the Master Service Agreement (**"MSA"**) with Tristream Energy, LLC;

     e.      To fund payment of the twenty-five (25) Amegy P-Cards (as defined below) held by the Debtor's employees; and

     f.      To fund any payments that may be due under loan agreement with Amegy Bank of Texas.

7.      A deposit account control agreement with Amegy has been entered into with respect to the Operating Account, and the Operating Account is pledged to Amegy under the Prepetition Credit Facility. In the ordinary course of business, Amegy will debit or sweep the Operating Account for a number of fees and expenses related to the cost of administering such account, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the **"Bank Fees"**). The Bank Fees are either debited directly from the Operating Account or are paid in connection with wire transfers.

8.      Amegy has issued twenty-five (25) procurement cards (the **"P-Cards"**) to the Debtor that are used in the ordinary course of business to purchase supplies, materials, goods and services incident to the Debtor's everyday business operations. Payment for amounts due on the

P-Cards is initiated by the Debtor and then drafted by Amegy from the Operating Account on a monthly basis.

9.      The nature of the Debtor's business makes it critical that the Operating Account be maintained for the duration of the Case. Disruption of the Operating Account would have a negative impact not only on the debtor's ability to pay its ordinary course of business obligations to vendors critical to its operations, and would disrupt payments coming in on accounts receivable, as well as payroll to the Debtor's fifty-five (55) employees.

**C.      Debtor's Emergency Motion for Order (1) Deeming Utilities Adequately Assured of Future Performance and (2) Establishing Procedures for Determining Requests for Additional Adequate Assurance Pursuant to Bankruptcy Code Section 366**

10.     Pursuant to the Debtor's *Emergency Motion for Order (1) Deeming Utilities Adequately Assured of Future Performance and (2) Establishing Procedures for Determining Requests for Additional Adequate Assurance Pursuant to Bankruptcy Code Section 366* ("**Utilities Motion**"), the Debtor seeks entry of an order: (a) prohibiting the Debtor's utility service providers (the "**Utility Provider(s)**") from altering, refusing, discontinuing service to, or discriminating against, the Debtor; (b) providing that security deposits to the Utility Providers, in an amount equal to one-half to the average monthly amount invoiced by each Utility Provider over a twelve month period, provides the Utility Providers "adequate assurance of payment" within the meaning of section 366; and (c) establishing procedures for determining requests by Utility Providers for additional assurances and determining that deposits made are adequate assurance until a final adjudication by the Court on this issue.

11.     In connection with the operation of their businesses, the Debtor obtains gas, water, sewer, electric, trash and other similar utility services provided the Utility Providers. By

their nature, such services are critical to the Debtor's business operations and cannot be replaced. Should one or more of the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted. The impact on the Debtor's operations, revenue and profits – not to mention the potential safety hazard created by a sudden loss of utility services at the facilities – would be extremely harmful and would jeopardize the Debtor's reorganization efforts. Uninterrupted utility services are essential to the Debtor's ongoing operations, and therefore, are integral to maximizing the value of the estate and the success of the Debtor's reorganization.

12.     The Debtor pays the Utility Providers, on average, approximately $47,413.00 a month in the aggregate for services rendered.[1] Prior to the Petition Date, the Debtor paid all amounts due to the Utility Providers on a timely basis. The Debtor plans to "warm idle" the plant immediately which will greatly reduce the monthly utility expenses. Therefore, the Debtor believes that a deposit for each Utility Provider equal to one-half of the current monthly average utility cost will more than protect each Utility Provider.  Likewise, the Debtor fully intends to pay post-petition obligations owed to each Utility Provider in a timely manner.

13.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate in the ordinary course without disruption.

---

[1]  The Debtor believes that some amount of the monthly amounts paid to the Utility Providers are for services that may not qualify as "utility" services for purposes of section 366 of the Bankruptcy Code, but that may constitute utility services under the Federal Power Act or other state or local regulations. The Debtor reserves the right to argue that some or all of the services provided by any given Utility Provider do not properly constitute "utility" services under section 366 of the Bankruptcy Code, and that, as such, section 366 of the Bankruptcy Code does not entitle such Utility Provider to adequate assurance with respect to such services.

**D.**     **Debtor's Emergency Motion for Authority to Pay Prepetition Wages and Salaries, Reimburse Prepetition Employee Business Expenses, Pay Other Prepetition Employee Benefits, and to Continue Benefit Programs in the Ordinary Course of Business**

14.     Pursuant to its *Emergency Motion for Authority to Pay Prepetition Wages and Salaries, Reimburse Prepetition Employee Business Expenses, Pay Other Prepetition Employee Benefits, and to Continue Benefit Programs in the Ordinary Course of Business* (the **"Wages Motion"**), the Debtor seeks an Order: (a) authorizing the Debtor to pay the prepetition Compensation, inclusive of Wages and Benefits, whether accrued or currently due and payable; (b) authorizing the Debtor to continue the Debtor's various employee benefit plans and programs post-petition in the ordinary course, including payment of all applicable plan administrators and other service providers; and (c) authorizing the Debtor to continue to pay Fidelity for payroll processing and related services on a post-petition basis in the ordinary course of business.

15.     Debtor directly employs fifty-five (55) individuals out "in the field" at its two facilities where, among other things, the Debtor processes, treats and sells natural gas, natural gas liquids, condensate and sulfur.  Given the nature of the Debtor's business, these Employees are highly skilled individuals who, in many instances, have special technical expertise in handling combustible, toxic or otherwise hazardous materials. Other of the Debtor's Employees oversee natural gas gathering via over 400 miles of pipelines, and handle cryogenic processing, acid gas treating, sulfur recovery and condensate treating and stabilization. The Debtor's Employees have a unique set of skills and training which is not easily replicable; it would take a minimum of two months to train new individuals before it would be safe for new individuals to

take over the existing Employees' jobs and responsibilities, and the safety and security of the facilities would be severely compromised in the interim.

16.     Maintaining these Employees is critical to the seamless transition of the Debtor's operations to a "warm idle" mode. As discussed above, the Employees perform a variety of critical functions for the Debtor's operations at the facilities. The Employees' technical skills and expertise, as well as their relationships with gas producers, vendors, and other third parties, are essential to the Debtor's continuing operations and to its ability to transition successfully into Chapter 11 and, ultimately, into a safe "warm idle" mode.

17.     The Debtor generates one payroll biweekly in arrears for its Employees utilizing the services of its third party payroll service, Fidelity Investments Payroll Services (**"Fidelity"**). The last prepetition payroll was funded to Fidelity on or about March 23rd, and payroll checks were issued to Employees on March 25, 2016.  Those checks covered work performed through March 20, 2016.  The next regular payroll within the cycle would ordinarily be funded on or about April 6th, paid on April 8th, and would cover work performed by the Employees from March 21-April 3, 2016.  The prepetition wages which are the subject of this Motion thus arise from work performed from March 21, 2016, through the day prior to the Petition Date (the period of March 21-29, 2016) (the **"Wages"**).

18.     In addition, as of the Petition Date, the Debtor had or may have had obligations for deductions from Employee paychecks used to make payments on behalf of the Employees for or with respect to, some or all of the following, among other things: medical, dental, vision, disability, and/or life insurance coverage plans administered by Parent; a 401(k) retirement savings plan; charitable contributions; garnishments; support payments; and/or amounts that are

due on behalf of employees to FICA and Medicare, all on account of which Debtor deducts a sum of money from an Employee's pay and pays that amount to a third party (the **"Benefits"**). As of the Petition Date, Debtor believes that none of the Employees had any outstanding and unpaid expense reports, and, while any particular Employee may well have accrued and will continue to accrue paid leave or other benefits, there are no amounts being paid to the Employees on account of unused vacation or holiday pay as part of the prepetition Wages earned March 21-29, 2016. The prepetition Wages and Benefits detailed above that are the subject of this Motion (the **"Compensation"**) an estimated total of $116,929.00.

19.     The Compensation owed to Employees will, in all or virtually all instances, qualify for the $12,475.00 priority status granted by 11 U.S.C. § 507(a)(4) to each individual Employee.

20.     I believe that paying prepetition amounts owed on account of the Employee obligations is in the best interests of the Debtor's estate and its stakeholders and will allow the Debtor's businesses operations to continue without interruption. To maintain its operations and preserve the value of its estate, it is essential that the Debtor continues to operate, to the extent possible, in the ordinary course of its business.  To achieve that result, the Debtor must retain the uninterrupted service and loyalty of its Employees.  The maintenance and continuation of employee programs, as well as the payment of amounts owing in respect thereof, is essential to this goal. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

E.     **Debtor's Emergency Motion for Extension of Time to File Schedules and Statement of Financial Affairs**

21.     Pursuant to Debtor's Emergency *Motion for Extension of Time to File Schedules and Statements of Financial Affairs* (the **"Extension Motion"**), Debtor seeks to extend the deadline for submission of its Schedules and Statements.

22.     Bankruptcy Code § 521 and Rule 1007 of the Federal Rules of Bankruptcy Procedure (**"Bankruptcy Rules"**) require the filing of schedules of assets and liabilities, current income and expenditures, executory contracts and unexpired leases, and statements of financial affairs (collectively, the **"Schedules and Statements"**) on or within 14 days from the date of the commencement of a bankruptcy case. 11 U.S.C. § 521; FED. R. BANKR. P. 1007(c). The court may extend the time for filing the Schedules and Statements for cause shown. FED. R. BANKR. P. 1007(c). Notice of any requested extension must be given to the Office of the United States Trustee for the Southern District of Texas (the **"UST"**), any committee appointed pursuant to Bankruptcy Code § 1102, and any other party that the Court directs. *Id.* The Debtor has not had sufficient time to assemble the requisite financial data and other information required by the Schedules. To prepare this information accurately, the Debtor must thoroughly examine its books, records and documents. The collection of this information will require substantial time and effort.

23.     The Debtor has already begun compiling the necessary information to complete the Schedules. The Debtor and its professionals are currently in the process of reviewing information in connection with the preparation of the Schedules, and will complete this process

as soon as possible. The Debtor expects to be able to complete this process on or before the extended deadline of April 30, 2016.

24.     Given the large amount of information that must be assembled and compiled and the number of hours that must be devoted by the Debtor's employees and professionals to the task of completing the Schedules and Statements, the Debtor believes a short extension is reasonable. Meanwhile, the Debtor will continue to work diligently to cooperate with ongoing information requests from the UST.

25.     I believe that the relief requested in the Extension Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor and its professionals to focus on key aspects of the Debtor's reorganization efforts in the days immediately following the Petition Date.