

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
04/07/2016

| | | |
|---|---|---|
| In re | § | **CASE NO. 16-31521** |
| | § | |
| **TRISTREAM EAST TEXAS, LLC,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | **Judge David R. Jones** |

**INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION FIRST LIEN SECURED PARTIES
PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE,
(IV) GRANTING LIENS AND SUPERPRIORITYCLAIMS, (V) MODIFYING THE
AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**
(Docket No. 12)

Upon the motion, dated April 1, 2016 (the "**Financing Motion**"), of Tristream East Texas,

LLC as debtor and debtor-in-possession (the "**Debtor**" or "**Borrower**") in the above-referenced

chapter 11 case (the "**Case**"), seeking first emergency consideration and the entry of an interim

order (this "**Interim Order**") granting the authority to enter into the DIP Facility and use Cash

Collateral in accordance with the Interim Budget, and then such authority on a final basis in

accordance with the Final Budget and the Final Order after notice and a Final Hearing[1] pursuant to

sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(e), 507, and 552 of

chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules

2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy

Rules**"), based upon the consideration of the Financing Motion, the arguments of counsel, the

testimony and other evidence proffered or presented at the hearing, and it appearing that approval

of the interim relief requested in the Financing Motion is necessary to avoid immediate and

---

[1] All capitalized terms used in this Interim Order are defined in the Financing Motion or the DIP Credit
Agreement.

4820-3792-8496.v2

irreparable harm to the Debtor pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtor, its creditors, its estate and all parties in interest, and is essential for the continued operation of the Debtor's business and/or the preservation of the value of the Debtor's assets, after due deliberation and consideration,

THE COURT HEREBY FINDS AND CONCLUDES ON AN INTERIM BASIS AS FOLLOWS:[2]

1.      **Petition Date**.   On March 30, 2016 (the **"Petition Date"**), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (this **"Court"**).  The Debtor has continued in the management and operation of its businesses and properties as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the **"Committee"**), trustee, or examiner has been appointed in the Case.

2.      **Jurisdiction and Venue**.   This Court has core jurisdiction over the Case, the Financing Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Case and proceedings on the Financing Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

3.      **Notice**.   The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the Financing Motion has been provided by the Debtor, whether by facsimile, electronic mail,

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

4820-3792-8496.v2

overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the Southern District of Texas (the "**United States Trustee**"), (ii) those entities or individuals included on the Debtor's list of 20 largest unsecured creditors, (iii) counsel to the Prepetition First Lien Agent (as defined below), (iv) the Prepetition First Lien Agent, (v) the DIP Lender, (vi) counsel to the DIP Lender, (vii) all other known creditors holding secured claims against the Debtor, and (viii) those persons who have formally appeared in the case and requested service pursuant to Bankruptcy Rule 2002. Under the circumstances, such notice of the Financing Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules, and no other notice need be provided for entry of this Interim Order.

      4.     **The Prepetition Credit Facility**.

      (a)     **Prepetition First Lien Credit Facility**.  Pursuant to that certain Credit Agreement dated as of July 15, 2010 (as amended, restated or otherwise modified from time to time, the "**Prepetition First Lien Credit Agreement,**" and collectively with any other agreements and documents executed or delivered in connection therewith, including the "**Loan Documents**" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition First Lien Loan Documents**"), among (a) Borrower, as borrower, (b) the financial institutions party thereto as "Lenders" (collectively, the "**Prepetition First Lien Lenders**"), and (c) ZB, N.A., d/b/a Amegy Bank, successor by merger to Amegy Bank National Association, as administrative agent (in such capacities, the "**Prepetition First Lien Agent**"[3] and, together with the Prepetition First Lien Lenders and any other party to which Prepetition First Lien

---

[3] The definition of the Prepetition First Lien Agent shall include its successors and assigns.

4820-3792-8496.v2

Obligations are owed, the **"Prepetition First Lien Secured Parties"**), the Prepetition First Lien Secured Parties agreed to extend loans and other financial accommodations to, and issue letters of credit for the account of, the Borrower pursuant to the Prepetition First Lien Loan Documents.  All obligations of the Debtor arising under the Prepetition First Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition First Lien Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the **"Prepetition First Lien Obligations."**

         b.      **The Asserted Prepetition First Liens and Prepetition First Lien Collateral**.  Pursuant to the Collateral Documents (as defined in the Prepetition First Lien Credit Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the **"Prepetition First Lien Collateral Documents"**), by and among each of the Loan Parties party thereto (the **"Grantors"**) and the Prepetition First Lien Agent, the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, was granted a first priority security interest in and continuing Lien (the **"Prepetition First Liens"**) on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" in which the Prepetition First Lien Secured Parties hold or assert a lien pursuant to the Prepetition First Lien Credit Agreement, any Prepetition First Lien Collateral Document or any other Prepetition First Lien Loan Document shall collectively be referred to herein as the **"Prepetition First Lien Collateral."**

-4-

5.      **The Debtor's Stipulation Regarding The Prepetition First Liens (the "Debtor's Stipulation")**.  Without waiver of and subject to the rights of any party in interest and the Committee during the Challenge Period detailed herein, the Debtor stipulates as follows:

(a)     **Amounts Owed under Prepetition First Lien Loan Documents**.  As of the Petition Date, the Debtor was justly and lawfully indebted and liable, without defense, counterclaim, or offset of any kind to the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents and in respect of loans made, letters of credit issued and other financial accommodations made by the Prepetition First Lien Secured Parties, in an aggregate principal amount of at least **$18,600,000.00**, *plus* accrued and hereafter accruing and unpaid interest thereon, additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts that the Prepetition First Lien Secured Parties may assert are due under the Prepetition First Lien Loan Documents.  Each of the Prepetition First Lien Loan Documents is valid, binding, and enforceable against the Debtor in accordance with its terms.

b.      As of the Petition Date, (I) the Prepetition First Liens (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (d) are subject and subordinate only to the Carve-Out (as defined below) and Permitted Prior Liens, if any, and (II) (a) the Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the

4820-3792-8496.v2

Debtor, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition First Lien Obligations exist, (y) no portion of the Prepetition First Lien Obligations or any payments made to any or all of the Prepetition First Lien Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the Guaranties (as defined in the Prepetition First Lien Credit Agreement) shall continue in full force and effect to unconditionally guaranty the Prepetition First Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Lender to the Debtor pursuant to the terms of this Interim Order or the DIP Loan Documents.

6.      **Findings Regarding the DIP Facility**.

    a.      **Interim Financing.**   The Debtor has requested the authority to obtain junior secured postpetition financing, which if approved on a final basis would consist of a revolving credit facility for up to $8,000,000.00 (the **"DIP Facility"** and loans extended under the DIP Facility, the **"DIP Loans"**), pursuant to the terms of this Interim Order, that certain Debtor-in-Possession Credit Agreement, dated as of March [ __ ], 2016 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the **"DIP Credit Agreement"**) by and among the Borrower and Haddington Energy Partners IV LP, as lender (the **"DIP Lender"**), in substantially the form attached to the Financing Motion, and any and all other Loan Documents (as defined

in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the **"DIP Loan Documents"**). During the Interim Period (as defined below), the DIP Lender is willing to provide financing to the Debtor subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of the DIP Loan Documents.

   b. **Need for Postpetition Financing**.  The Debtor has an immediate need to obtain the DIP Facility and use Cash Collateral, among other things, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, to safely idle the gathering and processing facilities and to otherwise preserve the value of the Debtor's estate.  The Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful reorganization and/or to otherwise preserve the enterprise value of the Debtor's estate.  Immediate and irreparable harm will be caused to the Debtor and its estate if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents.

   c. **No Credit Available on More Favorable Terms.**  The Debtor has been and continues to be unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and this Interim Order.

   7. **Adequate Protection for Prepetition First Lien Secured Parties**.   The Prepetition First Lien Secured Parties are entitled to adequate protection of any diminution in the value of their Prepetition First Lien Collateral as set forth herein pursuant to sections 361, 362, and 363 of the Bankruptcy Code.  Based on the Financing Motion and on the record presented to this

Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and use of the Cash Collateral during the Interim Period (as defined below) are fair and reasonable.

8.      **Business Judgment and Good Faith Pursuant to Section 364(e)**.

a.      The terms and conditions of the DIP Facility as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtor's agreement to the terms and conditions of the DIP Loan Documents reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

b.      The DIP Lender and the Debtor, with the assistance and counsel of their respective advisors, have acted in good faith and at arms' length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP Facility, the Debtor's use of Cash Collateral and proceeds of the DIP Facility and the DIP Loan Documents.  The DIP Loan Documents shall be deemed to have been extended and/or consented to by the DIP Lender in good faith, accordingly, the DIP Liens, the DIP Superpriority Claims (as defined below), and the other rights, benefits and protections granted to the DIP Lender hereunder (the **"DIP Protections"**) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

9.      **Resolution of Objection Filed by Prepetition First Lien Agent**.    On April 4, 2016, the Prepetition First Lien Agent filed an objection (Docket No. 23) to the relief granted in this Interim Order, which objection was resolved upon agreement via a

stipulation between the Prepetition First Lien Agent, the Debtor and the DIP Lender which was read into the record at the Interim Hearing.

10.     **Relief Essential; Best Interest**.  The Debtor has requested entry of this Interim Order on an emergency basis pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtor's estate, its business and properties and its ability to successfully reorganize or otherwise preserve the enterprise value of the Debtor's estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtor's estate and consistent with its fiduciary duties. Based on all of the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based upon the Court's consideration of the Financing Motion, the arguments of counsel, the testimony and other evidence proffered or presented at the hearing, and it appearing that approval of the interim relief requested in the Financing Motion is necessary to avoid immediate and irreparable harm to the Debtor pending further interim relief and/or the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtor, its creditors, its estate and all parties in interest, and is essential for the continued operation of the Debtor's business and/or the preservation of the value of the Debtor's assets, after due deliberation and consideration, and with the consent of the Debtor and the DIP Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

4820-3792-8496.v2

1.     **Motion Granted**.  The Financing Motion is hereby granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  Any objections to the Financing Motion with respect to the entry of this Interim Order that have not been withdrawn via stipulation, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.     **DIP Loan Documents and DIP Protections**.

a.     **Approval of DIP Loan Documents**.  The Debtor is expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations (as defined below), in accordance with, and subject to the terms of this Interim Order and the DIP Loan Documents, to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtor under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents.  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms.  Each officer of the Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtor.

b.     **DIP Obligations**.  For purposes of this Interim Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the Debtor under the DIP Credit Agreement and other DIP Loan Documents (including all

-10-

"Obligations" as defined in the DIP Credit Agreement) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Interim Order).

       c.      **Authorization to Incur DIP Obligations and Use Cash Collateral.**  To enable the Debtor to continue to operate its business and preserve and maximize the value of its estate, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) a Termination Event (as defined below), in each case unless extended by written agreement of the DIP Lender and the Prepetition First Lien Agent (the period from the entry of this Interim Order through and including such earliest date, the "Interim Period"), the Borrower is hereby authorized (x) to use Cash Collateral and to borrow under the DIP Facility strictly in accordance with the Interim Budget *through the week ending April 15, 2016* with disbursements not to exceed more than 10% of the aggregate expenses provided therein, **plus** (y) the Debtor is authorized to use Cash Collateral and proceeds of the DIP Facility to pay any amounts owed to third party vendors that arise *between April 15, 2016 and April 18, 2016*.

       d.      Commencing on March 31, 2016 and continuing five business days before the first of each month thereafter (i.e., every month), the Debtor shall prepare and deliver simultaneously to the DIP Lender and the Prepetition First Lien Agent: (i) an updated "rolling" one month budget (reflecting the prior month's actual income and expenses and projected income and expenses for the upcoming month), which, once approved in writing by each of the DIP Lender and the Prepetition First Lien Agent in their respective sole

discretion, shall supplement and replace the then-existing budget without further notice, motion, or application to, order of, or hearing before, this Court; provided, however, that the DIP Lender shall have five business days to approve each updated "rolling budget" (failure of DIP Lender to timely provide the Debtor written notice of any objection to such updated "rolling budget" shall be deemed to have approved such updated "rolling budget"). The initial Interim Budget, as modified by all supplemental approved budgets, plus a 10% overage for expenses incurred in any given month, shall constitute the "Final Budget."

      e.    **Budget Covenants.**  The Debtors shall only incur DIP Obligations and expend Cash Collateral and proceeds of the DIP Facility in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (and in the case of the costs and expenses of the (i) DIP Lender, in accordance with the DIP Loan Documents and this Interim Order and (ii) the Prepetition First Lien Agent in accordance with this Interim Order, without being limited by the Approved Budget).

      f.    **Interim Interest, Fees, Costs, and Expenses.**  The amounts actually borrowed under the DIP Loan Documents within the Interim Period shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court. Subject to the other terms of this Interim Order, the Debtor shall additionally pay all fees, costs, expenses (including reasonable out of pocket legal and other professional fees and expenses of the DIP Lender) and other charges payable under the terms of the DIP Loan Documents.

g.      **Interim Interest, Fees, Costs, and Expenses**.  Cash Collateral actually used within the Interim Period shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the Prepetition First Lien Credit Agreement, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  Subject to the other terms of this Interim Order, the Debtor shall additionally pay all fees, costs, expenses (including reasonable out of pocket legal and other professional fees and expenses of the Prepetition First Lien Agent) and other charges if such fees, costs and expenses are payable under the terms of the Prepetition First Lien Credit Agreement.

h.      **Use of Funds Borrowed Under the DIP Facility**.  During the Interim Period, the Borrower shall use all funds borrowed under the DIP Facility solely in accordance with the Interim Budget, this Interim Order and the DIP Loan Documents.

i.      **Conditions Precedent**.  The DIP Lender has no obligation to extend credit under the DIP Facility or permit use of any proceeds of the DIP Facility during the Interim Period unless and until all conditions precedent to the extension of credit and/or use of loan proceeds as set forth in the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lender in accordance with the DIP Loan Documents and this Interim Order.

j.      **DIP Liens**.  As security for the DIP Obligations, effective as of the Petition Date, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Interim Order, are hereby granted by the Debtor to the DIP Lender (such security interests and Liens granted to the DIP Lender

pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"), on all property of the Debtor and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located; provided, however, that Liens on Avoidance Actions (as defined below) and the proceeds thereof are not granted via this Interim Order but shall only be granted subject to the entry of the Final Order (all of the foregoing collateral collectively referred to as the "DIP Collateral"):

> (I)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all **unencumbered** DIP Collateral, including, subject to the entry of the Final Order, the Debtor's claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing (collectively, the "Avoidance Actions", which for avoidance of doubt, excludes Debtor's claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise; and

> (II)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all DIP Collateral, which DIP Lien shall be junior only to the Prepetition First Liens, the First Lien Adequate Protection Liens,  and the Carve-Out.

k.     **DIP Lien Priority.**  The DIP Liens granted to the DIP Lender shall be junior Liens that (i) are subject only to the Prepetition First Liens, the First Lien Adequate Protection Liens, and Prior Permitted Liens, if any, and to the extent provided in this Interim Order, the Final Order and the DIP Loan Documents, shall also be subject to the Carve-Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to all postpetition Liens or other interests of any kind of any other person or entity.

4820-3792-8496.v2

l.      **Enforceable Obligations.**  The DIP Loan Documents and this Interim Order shall constitute and evidence the valid and binding DIP Obligations of the Debtor, which DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto (including any trustee or other estate representative in any Successor Case (as defined below), and its creditors and other parties-in-interest, in accordance with their terms.

m.      **Superpriority Administrative Claim Status.**  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment the Carve-Out in accordance with this Interim Order, over all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against the Debtor or its estate (except as otherwise provided herein), now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and, except as otherwise provided herein, shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof, including, subject to the entry

of the Final Order, Avoidance Actions and the proceeds thereof.  Other than as expressly provided in the DIP Credit Agreement, this Interim Order and/or the Final Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Loan Documents and/or this Interim Order.

n.      **Priority of DIP Liens and DIP Superpriority Claims.**  The DIP Liens and the DIP Superpriority Claims : (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with any Lien that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or otherwise, (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Case, upon the conversion of any of the Case to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Case.

o.      **Payments to the DIP Lender.**  During the Interim Period, the Debtor shall not make any payment or distribution of any character, whether in cash, securities or other property, to the DIP Lender nor shall the DIP Lender receive or accept, on account of the DIP Obligations or otherwise, or in respect of the redemption, retirement, purchase or other acquisition thereof (collectively a "Loan Payment").

-16-

3.      **Adequate Protection for Prepetition First Lien Secured Parties**.  In consideration for the use of Cash Collateral and as adequate protection for, and to secure payment of an amount equal to the Prepetition First Lien Collateral, the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, is hereby granted first lien adequate protection liens and superpriority administrative claims (collectively referred to as the "Prepetition First Lien Adequate Protection") as set forth below:

a.      **First Lien Adequate Protection Liens.**  To the extent there is a diminution in value of the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale, or lease by the Debtor of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition First Liens to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Prepetition First Lien Collateral Value"), the Prepetition First Lien Agent, for the benefit of all the Prepetition First Lien Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, (A) first priority replacement Liens upon all of the DIP Collateral, excluding Avoidance Actions and the proceeds thereof (such adequate protection replacement Liens, the "First Lien Adequate Protection Liens"), which First Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the Prepetition First Liens and the Carve-Out; and (B) an allowed superpriority administrative claim which shall have priority, subject only to the Carve-Out in accordance with this Interim Order, over all administrative expense claims, priority and other

-17-

unsecured claims, and all other claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment, which shall have recourse to and be payable from the DIP Collateral, other than Avoidance Actions.

b.     **Priority of First Lien Adequate Protection Liens Subject to Entry of the Final Order.**  Subject to entry of the Final Order, the First Lien Adequate Protection Liens (A) shall not be subject to sections 506(c), 510, 549, 550 or the "equities of the case" exception of section 552 of the Bankruptcy Code , (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims against the Debtor or the Debtor's property, and (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Case or any Successor Case, and/or upon the dismissal of any of the Case.

c.     **Right to Seek Additional Adequate Protection.**  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, this Court finds on an interim basis that the adequate protection provided herein is reasonable to protect the interests of the Prepetition First Lien Secured Parties on an interim basis.  However, the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Secured Parties, may request Court approval for additional or alternative adequate

protection, without prejudice to any objection of the Debtor or any other party in interest to the grant of any additional or alternative adequate protection.

4.    **Automatic Postpetition Lien Perfection.**   This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the First Lien Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and, subject to the other terms and priorities set forth in this Interim Order, the DIP Lender  and the Prepetition First Lien Agent shall be deemed, without any further action, to have control over all the Debtor's deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (c) taking any other action to validate or perfect the DIP Liens and the First Lien Adequate Protection Liens or to entitle the DIP Liens and the First Lien Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Lender and the Prepetition First Lien Agent  (in the latter case, solely with respect to the First Lien Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date.  To the extent that the Prepetition First Lien Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under the Debtor's insurance

policies, or is the secured party under any of the Prepetition First Lien Loan Documents, the DIP Lender shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtor's insurance policies, and the secured party under each such Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that.

      5.      **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtor's Stipulation shall be binding upon the Debtor and its estate in all circumstances upon entry of this Interim Order.  The Debtor's Stipulation shall be binding upon each other party in interest, including the Committee, except to the extent and only to the extent such Committee or, solely as provided in clause (y) below, any other party in interest with standing (including any chapter 11 trustee) other than the Debtor (or if the Case is converted to a case under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), *first*, commences, by the earlier of (x) with respect to any Committee, sixty (60) calendar days after the formation of any Committee, and (y) solely if no Committee is formed, with respect to other parties in interest with requisite standing other than the Debtor or any Committee, sixty (60) calendar days following the date of entry of the Interim Order (such time period established by the earlier of clauses (x) and (y), as the same may be extended in accordance with this Paragraph, shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, challenging or otherwise objecting to the admissions, stipulations, findings, or

4820-3792-8496.v2

releases included in the Debtor's Stipulation, or (B) a contested matter, adversary proceeding against any or all of the Prepetition First Lien Secured Parties in connection with or related to the Prepetition First Lien Obligations, or the actions or inactions of any of the Prepetition First Lien Secured Parties arising out of or related to the Prepetition First Lien Obligations or the Prepetition First Lien Loan Documents, including any claim against any or all of the Prepetition First Lien Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition First Lien Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties) (clauses (i) and (ii) collectively, the "Challenges" and, each individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"). If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in this Case and any Successor Case (and after the dismissal of this Case or any Successor Case), (i) all payments made to or for the benefit of the Prepetition First Lien Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived,

4820-3792-8496.v2

and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtor's Stipulation, including the release provisions therein, shall be binding on all parties in interest in this Case or any Successor Case, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtor's Stipulation and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that the Debtor's Stipulation or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge. The Challenge Period may be extended only with the written consent of the Prepetition First Lien Agent in its sole discretion. | or further court order Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtor's estate. The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtor's estate shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph or to require or permit an extension of the Challenge Period Termination Date; provided, however, that if the Committee files a motion for standing to assert any Challenge prior to the Challenge Period Termination Date (and provided that the relevant pleading asserting such Challenge is attached as an exhibit to such motion), then the Challenge Period Termination Date shall be tolled, solely for the Committee and solely with

-22-

respect to such Challenge set forth in the exhibit to such motion, until three (3) business days after the Court rules on such motion.

      6.    **Carve-Out.**  Subject to the terms and conditions contained in this Paragraph, each of the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, and the First Lien Adequate Protection Liens shall be subject and subordinate to payment of the Carve-Out in accordance with the terms set forth below:

      a.    **Carve-Out.**  "Carve-Out" means (a) all unpaid fees required to be paid in this case to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) the reasonable unpaid fees, costs, and disbursements of professionals retained by the Debtor in this Case (collectively, the "Debtor's Professionals") that are incurred prior to the delivery by the Prepetition First Lien Agent or the DIP Lender of a Carve-Out Trigger Notice (as defined below), are in accordance with first the Interim Budget and then the Final Budget and are allowed by this Court under sections 327, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals and any other available proceeds of unencumbered assets of the Debtor; (c) the reasonable unpaid fees, costs, and disbursements of professionals retained by the Committee in this Case (collectively, the "Committee's Professionals"), in each case that are incurred prior to the delivery by the Prepetition First Lien Agent or the DIP Lender of a Carve-Out Trigger Notice and in accordance with the Final Budget, and that are allowed by this Court under sections 328, 330, or 1103 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals and any other available proceeds of unencumbered assets of the Debtors, in an aggregate amount (for both Committee Members and the

-23-

Committee's Professionals) not to exceed $50,000.00; (d) the reasonable unpaid fees, costs, and disbursements of the Debtor's Professionals that are incurred after the delivery of a Carve-Out Trigger Notice by the Prepetition First Lien Agent or the DIP Lender and are in an aggregate amount not to exceed $100,000.00 (the "Debtor's Professionals Carve-Out Cap"); and (e) the reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice by the Prepetition First Lien Agent or the DIP Lender, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $25,000.00 (the "Committee Carve-Out Cap" and, together with the Debtor's Professionals Carve-Out Cap, the "Post-Default Carve-Out Cap").  The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the Prepetition First Lien Agent or the DIP Lender to the Debtor's counsel, the United States Trustee, and lead counsel to any Committee appointed in this Case, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event (as defined below), expressly stating that the Post-Default Carve-Out Cap is triggered.  The DIP Lender shall be entitled to establish and maintain reserves against borrowing availability under the DIP Facility on account of the Carve-Out (including, for avoidance of doubt, the DIP Lender's estimate of future fees and expenses of the Debtor's Professionals, the Committee's Professionals and the Committee Members that may be incurred before or after the delivery of a Carve-Out Trigger Notice) in accordance with the terms of the DIP Credit Agreement.  No amounts set forth in this subparagraph with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the Prepetition First Lien Agent and the DIP Lender.

b.      **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.** Neither the DIP Lender nor the Prepetition First Lien Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtor's Professionals, Committee's Professionals or Committee Members incurred in connection with the case or any Successor Case under any chapter of the Bankruptcy Code.

7.      **Waiver of 506(c) Claims**. Upon entry of the Interim Order, in the case of the DIP Lender (and their DIP Liens and their other rights in respect of the DIP Collateral, the Prepetition First Lien Collateral and Cash Collateral), and subject to the entry of the Final Order solely in the case of the Prepetition First Lien Secured Parties (and their Prepetition First Liens and their other rights in respect of the DIP Collateral, the Prepetition First Lien Collateral and Cash Collateral), and as a further condition of (i) the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Lender to the payment of the Carve-Out to the extent provided herein) and (ii) the Debtor's use of Cash Collateral pursuant to this Interim Order and a Final Order, no costs or expenses of administration of the Case or any Successor Case shall be charged against or recovered from or against any or all of the DIP Lender and/or the Prepetition First Lien Secured Parties, the Prepetition First Lien Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender and the Prepetition First Lien Agent.

8.      **Cash Collection**. From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral and all Cash Collateral that shall at any time come into the possession, custody, or control of the Debtor, or to which the Debtor is now or shall

4820-3792-8496.v2

become entitled at any time, shall be promptly deposited in the Operating Account identified in the Order Granting Debtor's Emergency Motion to Approve (1) Maintenance of Pre-Petition Bank Accounts and (2) Continued Use of Existing Checks and Business Forms entered as a "first day" Order (the "Cash Management Order").

9. **Termination Events (Interim Order).** The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by the Prepetition First Lien Agent and the DIP Lender (each, a "Termination Event"):

a. The dismissal of the Case or the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code during the Interim Period;

b. The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code by any entity other than the Prepetition First Lien Agent or the Prepetition First Lien Secured Parties with respect to the Prepetition First Lien Collateral or the DIP Collateral during the Interim Period;

c. The Debtors entry into or seeking approval by the Court of any plan, restructuring transactions, or asset sale that is not in form and substance acceptable to the Prepetition First Lien Agent during the Interim Period;

d. The appointment or election of a trustee, examiner with expanded powers or any other representative with expanded powers relating to the operation of the businesses in the Case during the Interim Period;

e. During the Interim Period, the failure by the Debtor to make any payment required pursuant to this Interim Order when due, provided however, that the Prepetition First Lien Agent or the DIP Lender shall give notice of such alleged failure to pay and the Debtor shall have five (5) business days to cure;

f.       The failure by the Debtor to deliver to the Prepetition First Lien Agent information that is (i) reasonably requested and (ii) to which the Prepetition First Lien Agent is otherwise entitled under the Prepetition First Lien Loan Documents relating to the Debtor's business operations, business plan and prospects, and such failure remains uncured after five (5) business days written notice;

g.       Failure by the Debtor to observe or perform any of the material terms or material provisions contained herein during the Interim Period;

h.       The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth there (a **"DIP Default Termination Event"**), including, for avoidance of doubt, the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Lender, on or before May 15, 2016 or such other date after May 15, 2016 to which Debtor and the DIP Lender may agree.

i.       Any other material breach, default or other violation by the Debtor of the terms and provisions of this Interim Order.

10.     **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility or Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition First Lien Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Case or any Successor Case, or any other person, party, or entity (including any of the Debtor's Professionals, the Committee's Professionals or the Committee Members) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the Prepetition First Lien Collateral or the DIP Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) the

4820-3792-8496.v2

Debtor, any Committee, or any trustee or other estate representative appointed in the Case or any Successor Case, or any other person, party, or entity (including any of the Debtor's Professionals, the Committee's Professionals or the Committee Members) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the Prepetition First Lien Agent or DIP Lender (on terms consistent with the terms and priorities set forth in this Interim Order), or to seek any modification of this Interim Order not approved by the Prepetition First Lien Agent and the DIP Lender and, to the extent such modification would affect the rights of any of the Prepetition First Lien Secured Parties, the Prepetition First Lien Agent; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Lender, the Prepetition First Lien Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations and/or the Prepetition First Lien Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition First Liens, or the First Lien Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition First Liens, the First Lien Adequate

4820-3792-8496.v2

Protection Liens, or the other Prepetition First Lien Adequate Protection; (D) except to contest in good faith the occurrence or continuance of any alleged Termination Event, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Lender's or the Prepetition First Lien Secured Parties' assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral or the Prepetition First Lien Collateral in accordance with the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, and this Order; and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, or any payments made thereunder or in respect thereof; provided, however, up to $25,000 in the aggregate of the Carve-Out, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents (but not the claims and/or Liens of the DIP Lender) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition First Lien Secured Parties) who has proposed or may propose to purchase interests in the Debtor without the prior written consent of the DIP Lender and the Prepetition First Lien Agent.

11.    **Proofs of Claim**. The Prepetition First Lien Secured Parties will not be required to file proofs of claim in the Case or Successor Case for any claim allowed herein. The Debtor's Stipulation shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Secured Parties in respect of all Prepetition First Lien Obligations. In addition, the Prepetition First Lien Secured Parties and the DIP Lender will not be required to file any request for allowance

4820-3792-8496.v2

and/or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition First Lien Obligations or adequate protection granted hereunder constituting administrative expenses or any DIP Obligations, as applicable.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in the Case or Successor Case to the contrary, each of the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, and the DIP Lender is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in the Case or Successor Case (i) in the case of Prepetition First Lien Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition First Lien Obligations, or a request or aggregate requests for allowance and/or payment of any portion of the Prepetition First Lien Obligations or adequate protection granted herein constituting administrative expenses, and (ii) in the case of the DIP Lender, a request or aggregate requests for allowance and/or payment of any portion of the DIP Obligations constituting administrative expenses, as applicable.

12.    **Preservation of Rights Granted Under the Interim Order**.

(a)    **Modification or Amendment of Interim Order**.    In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the

Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Lender and the Prepetition First Lien Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections or the Prepetition First Lien Adequate Protection incurred or granted by the Debtor prior to the actual receipt of written notice by the DIP Lender or  the Prepetition First Lien Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Lender, the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties shall be entitled to all of the protections and other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)      **Dismissal.**  If any order dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) all protections and other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender, the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions first of this Interim Order, and then the Final Order as and when entered (and shall maintain their respective priorities as provided by this Interim Order and the Final

Order as and when entered) until all DIP Obligations and all Prepetition First Lien Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such protections and other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender, the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, respectively.

(c)     **Survival of the Provisions of the Interim Order**.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the protections and other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender, the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing the Case, withdrawing of the reference of the Case or any Successor Case or providing for abstention from handling or retaining of jurisdiction of the Case or any Successor Case in this Court, or by any other act or omission.  The terms and provisions of this Interim Order and all rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender, the Prepetition First Lien Agent, and the Prepetition First Lien Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order referenced in the preceding paragraph, and such protections and other rights, remedies, Liens priorities, privileges, protections and benefits, shall continue in full force and effect

in these proceedings and in any Successor Case and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order.  Pursuant to any chapter 11 plan of reorganization with respect to the Debtor, the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  \

13.   **Insurance Policies**.   Upon entry of this Interim Order, the DIP Lender, the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtor that in any way relates to the DIP Collateral, and the Debtor shall take such actions as are reasonably requested by the DIP Lender and the Prepetition First Lien Agent from time to time to evidence or effectuate the foregoing.

14.   **Other Rights and Obligations**.

a.   **Notice of Professional Fees.**   Professionals for the DIP Lender and the Prepetition First Lien Agent (including professionals engaged by counsel to the DIP Lender or Prepetition First Lien Agent, as applicable) (collectively, the "Lender Professionals") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest.  Copies of summary invoices submitted to the Debtors by such Lender Professionals and shall be forwarded by the Debtor to the United States Trustee, counsel for any Committee, and such other parties as this Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; provided, however, that such summary invoices may be redacted

to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtor, United States Trustee or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten days of receipt of such invoices, then the Debtor, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtor shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.  All such unpaid fees, costs, expenses, and charges of the  DIP Lender that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee or the Committee (or any subsequent trustee of the Debtor's estate) in accordance with the terms

-34-

hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order.

b.     **Binding Effect**.  The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Case and any Successor Case, including the DIP Lender, the Prepetition First Lien Secured Parties, any Committee, and the Debtor and its estate, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor), whether in the Case, in any Successor Case, or upon dismissal of the Case or Successor Case; provided, however, that the DIP Lender and the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estate of the Debtor in any Case or Successor Case.

c.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) to permit each of the DIP Lender, the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties to perform any act authorized under this Interim Order, and (ii) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

d.     **No Waiver.**  The failure of the Prepetition First Lien Secured Parties or the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition First Lien Loan Documents, the DIP Loan Documents or otherwise

-35-

(or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise. Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition First Lien Secured Party or the DIP Lender (or the right of a Debtor to contest such assertion).

  e.  **No Third Party Rights.** Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary. In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Lender and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtor, its creditors, members, or estate.

  f.  **No Marshaling.** Neither the DIP Lender nor the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as applicable.

  g.  **Inconsistency.** In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this

-36-

4820-3792-8496.v2

Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a "first day order", the provisions of this Interim Order shall govern and control.

      h.    **Enforceability.**  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

15.    **Further Interim Hearing**

      a.    This Interim Order authorizes the Debtor to use Cash Collateral and proceeds of the DIP facility as set forth on the Interim Budget through the week ending April 15, 2016, **plus** to use Cash Collateral and proceeds of the DIP Facility to pay any amounts owed to third party vendors that arise *between April 15, 2016 and April 18, 2016.* A further interim hearing to consider entry of an additional interim order is scheduled for **April 18, 2016, at 3:30 P.M.** (prevailing Central time) at the United States Bankruptcy Court for the Southern District of Texas.  The proposed additional interim order shall be substantially the same as this Interim Order.

      b.    **Further Interim Hearing Notice.**  On or before **April 6, 2016**, the Debtor shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the further interim hearing set for April 18, 2016), (i) notice of the entry

4820-3792-8496.v2

of this Interim Order and of the date set for the further interim hearing (the "Further Interim Hearing Notice") and (ii) a copy of this Interim Order on the parties having been given notice of the first Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Further Interim Hearing Notice shall state that any party in interest objecting to the entry of a further interim order must file written objections with the Clerk of the Bankruptcy Court which objections must be served on:  the Debtor, the Debtor's counsel, counsel for the DIP Lender, counsel for the Prepetition First Lien Agent, and the Office of the United States Trustee for the Southern District of Texas, and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of Texas.

16.     **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

**IT IS SO ORDERED.**

**Signed:  April 07, 2016.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

4820-3792-8496.v2

<u>**SUBMITTED BY**</u>:

Frank J. Wright
C. Ashley Ellis
Erin C. McGee
**COATS ROSE, P.C.**
600 Signature Place
14755 Preston Road
Dallas, TX  75254
(972) 788-1600
 (972) 239-0138 - fax
bankruptcy@coatsrose.com

**ATTORNEYS FOR DEBTOR**

4820-3792-8496, v. 2

4820-3792-8496.v2

Tristream East Texas, LLC
Weekly Cash Forecast
3/30/2016

| | Cash Forecast by Week | |
|---|---|---|
| | Period of<br>3/31-4/8 | Week of<br>4/11 - 4/15 |
| Beginning Balance for the week | $    258,900.47 | $    22,642.82 |
| **DIP Funding** | | |
| **Expected Receivables** | | |
| Lonestar | | |
| Texon | | |
| Oxbow | | |
| Sunoco | | |
| Upstream | 21,804.93 | |
| **Expected Payments** | | |
| Producer Payables | | |
| Producer Payables- Vanguard | | |
| Valence | 19,728.90 | |
| | | |
| **Estimated Opex** | | |
| Payroll | (163,863.50) | |
| Benefits (401K match, FICA, & Medicare Tax) | (18,024.99) | |
| Travel | | (1,700.00) |
| Vehicle Expenses | | (18,082.00) |
| Materials & Parts | | (35,000.00) |
| Utilities- Deposit | (27,271.00) | |
| Utilities | | |
| Chemicals, Lubricants, Corrosion Supplies | (23,250.00) | (23,250.00) |
| Contractors | (42,632.00) | (42,632.00) |
| Office Supplies | | (4,802.00) |
| Safety Training & Equipment (PPE, Air packs, H2S sensors, other) | (2,750.00) | (2,750.00) |
| Right of Way payments to landowners | | |
| | | |
| Payments to Tristream Energy, LLC for following: | | |
| United Healthcare- Premiums for Medical Insurance | | (71,179.00) |
| Guardian- Premiums for Dental, Vision, STD, LTD, AD&D,Life Insurance | | (12,855.00) |
| Flat Iron Capital- Commercial Insurance Premium | | (68,361.16) |
| FSP- Westchase- Houston Office Rent | | (14,313.00) |
| Other Houston Office Expenses- Travel&Lodging, Supplies, Telephones,IT,Misc | | (5,000.00) |
| | | |
| Ending Balance for the week | 22,642.82 | (277,281.35) |
| Net weekly change | | (299,924.16) |

**REVISED
EXHIBIT "A"**

K&S DRAFT 04/05/16

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

among

**TRISTREAM EAST TEXAS, LLC,**

as the Borrower,

**HADDINGTON ENERGY PARTNERS IV, LP,**

as Administrative Agent

and

The Lenders Party Hereto

**$8,000,000**

**SECURED REVOLVING CREDIT FACILITY**

Dated as of April [___], 2016

Error! Unknown document property name.
28521970

EXHIBIT "B"

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I.     DEFINITIONS AND ACCOUNTING TERMS ............................................. 1
    1.01     Defined Terms........................................................................................... 1
    1.02     Other Interpretive Provisions.................................................................. 15
    1.03     Accounting Terms................................................................................... 15
    1.04     Rounding................................................................................................. 16
    1.05     References to Agreements and Laws........................................................ 16

ARTICLE II.     THE REVOLVING COMMITMENTS AND BORROWINGS ................... 16
    2.01     Revolving Loans...................................................................................... 16
    2.02     Reserved.................................................................................................. 16
    2.03     Prepayments............................................................................................ 16
    2.04     Reduction or Termination of Aggregate Revolving Commitments .......... 17
    2.05     Repayment of Revolving Loans............................................................... 17
    2.06     Interest..................................................................................................... 17
    2.07     Fees ......................................................................................................... 18
    2.08     Computation of Interest and Fees............................................................ 18
    2.09     Evidence of Debt..................................................................................... 18
    2.10     Payments Generally................................................................................. 18
    2.11     Sharing of Payments................................................................................ 20
    2.12     Reserved.................................................................................................. 20
    2.13     [Reserved]............................................................................................... 20
    2.14     Reserved.................................................................................................. 20
    2.15     Payment of Obligations........................................................................... 20

ARTICLE III.     TAXES, YIELD PROTECTION AND ILLEGALITY ............................. 20
    3.01     Taxes....................................................................................................... 20
    3.02     Reserved.................................................................................................. 22
    3.03     Reserved.................................................................................................. 22
    3.04     Increased Cost and Reduced Return; Capital Adequacy........................... 22
    3.05     Reserved.................................................................................................. 22
    3.06     Matters Applicable to all Requests for Compensation.............................. 23
    3.07     Survival................................................................................................... 23
    3.08     Mitigation Obligations............................................................................ 23
    3.09     Replacement of Lenders.......................................................................... 23

ARTICLE IV.     CONDITIONS PRECEDENT TO CREDIT EXTENSION ...................... 24
    4.01     Conditions Precedent............................................................................... 24
    4.02     Conditions to all Credit Extensions......................................................... 25

ARTICLE V     REPRESENTATIONS AND WARRANTIES........................................... 26
    5.01     Existence; Qualification and Power; Compliance with Laws.................... 26
    5.02     Authorization; No Contravention............................................................. 26
    5.03     Governmental Authorization.................................................................... 26
    5.04     Binding Effect......................................................................................... 26
    5.05     Financial Statements; No Material Adverse Effect................................... 26
    5.06     Litigation................................................................................................. 27
    5.07     No Default................................................................................................ 27

i

**Error! Unknown document property name.**

5.08     Ownership of Property; Liens ............................................................................27
5.09     Environmental Compliance ...............................................................................27
5.10     Insurance ...........................................................................................................27
5.11     Taxes ..................................................................................................................27
5.12     ERISA Compliance ...........................................................................................28
5.13     Subsidiaries and other Investments ..................................................................28
5.14     Margin Regulations; Investment Company Act; Use of Proceeds ...................28
5.15     Disclosure ..........................................................................................................29
5.16     Compliance with Laws ......................................................................................29
5.17     Third Party Approvals .......................................................................................29
5.18     Reserved ............................................................................................................29
5.19     Maintenance of Property ...................................................................................29
5.20     Intellectual Property ..........................................................................................29
5.21     Anti-Terrorism ..................................................................................................30
5.22     Reorganization Matters .....................................................................................30

ARTICLE VI.     AFFIRMATIVE COVENANTS ...............................................................31
6.01     Financial Statements .........................................................................................31
6.02     Certificates; Other Information .........................................................................31
6.03     Notices ...............................................................................................................32
6.04     Payment of Obligations .....................................................................................33
6.05     Preservation of Existence, Etc. .........................................................................33
6.06     Maintenance of Assets and Business .................................................................33
6.07     Maintenance of Insurance ..................................................................................33
6.08     Compliance with Laws and Contractual Obligations ........................................34
6.09     Books and Records .............................................................................................34
6.10     Inspection Rights ...............................................................................................34
6.11     Compliance with ERISA ....................................................................................34
6.12     Use of Proceeds .................................................................................................34
6.13     Material Contracts ..............................................................................................35
6.14     [Reserved] ..........................................................................................................35
6.15     Further Assurances; Additional Collateral ........................................................35
6.16     Budget Compliance ............................................................................................35
6.17     Fiscal Year .........................................................................................................35
6.18     Reserved ............................................................................................................35
6.19     Reserved ............................................................................................................35

ARTICLE VII     NEGATIVE COVENANTS. .....................................................................35
7.01     Liens ...................................................................................................................36
7.02     Investments ........................................................................................................37
7.03     Reserved ............................................................................................................37
7.04     Indebtedness ......................................................................................................37
7.05     Lease Obligations ..............................................................................................38
7.06     Fundamental Changes ........................................................................................38
7.07     Dispositions .......................................................................................................39
7.08     Restricted Payments; Distributions and Redemptions ......................................39
7.09     ERISA ................................................................................................................39
7.10     Nature of Business; Capital Expenditures .........................................................39
7.11     Transactions with Affiliates ..............................................................................40
7.12     Burdensome Agreements ...................................................................................40
7.13     Use of Proceeds .................................................................................................40

ii

7.14    Organization Documents; Material Contracts............................................40
7.15    Change of Control............................................................................40
7.16    OFAC...........................................................................................40
7.17    Bankruptcy Claims...........................................................................41

ARTICLE VIII.   EVENTS OF DEFAULT AND REMEDIES ...............................41
8.01    Events of Default.............................................................................41
8.02    Remedies Upon Event of Default ........................................................44
8.03    Application of Funds.........................................................................44
8.04    Performance by Administrative Agent...................................................44

ARTICLE IX.    ADMINISTRATIVE AGENT.......................................................45
9.02    Delegation of Duties.........................................................................45
9.03    Default; Collateral............................................................................45
9.04    Liability of Agents............................................................................47
9.05    Reliance by Administrative Agent.........................................................47
9.06    Notice of Default..............................................................................48
9.07    Credit Decision; Disclosure of Information by Administrative Agent ............48
9.08    Indemnification of Agents...................................................................48
9.09    Administrative Agent in its Individual Capacity.......................................49
9.10    Successor Administrative Agent...........................................................49
9.11    Other Agents...................................................................................49
9.12    Administrative Agent May File Proofs of Claim.......................................50
9.13    Reserved........................................................................................50

ARTICLE X     MISCELLANEOUS.....................................................................50
10.01   Amendments, Release of Collateral, Etc.................................................50
10.02   Notices and Other Communications; Facsimile Copies...............................52
10.03   No Waiver; Cumulative Remedies........................................................52
10.04   Attorney Costs; Expenses and Taxes....................................................53
10.05   Indemnification................................................................................53
10.06   Payments Set Aside..........................................................................54
10.07   Successors and Assigns......................................................................54
10.08   Confidentiality.................................................................................57
10.09   Set-off...........................................................................................57
10.10   Interest Rate Limitation.....................................................................57
10.11   Counterparts...................................................................................58
10.12   Integration......................................................................................58
10.13   Survival of Representations and Warranties.............................................58
10.14   Severability.....................................................................................58
10.15   Governing Law.................................................................................58
10.16   Consent to Jurisdiction.......................................................................59
10.17   Imaging Loan Documents...................................................................59
10.18   ENTIRE AGREEMENT......................................................................59

iii

SCHEDULES

2.01    Revolving Commitments
5.06    Litigation
5.13    Subsidiaries and other Equity Investments
7.01    Existing Liens
7.04    Indebtedness
10.02   Addresses for Notices to Borrower, Guarantors and Administrative Agent

EXHIBITS

Exhibit:         Form of:

A-1              Borrowing Notice
A-3              Repayment Notice
B                Revolving Note
D                Assignment and Assumption

**Error! Unknown document property name.**

## CREDIT AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of April [__], 2016, among TRISTREAM EAST TEXAS, LLC, a Delaware limited liability company (the "***Borrower***"), a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined), each lender from time to time party hereto (collectively, the "***Lenders***" and individually, "***Lender***"), and HADDINGTON ENERGY PARTNERS IV, LP, as Administrative Agent.

## PRELIMINARY STATEMENTS

WHEREAS, on March 30, 2016 (the "***Petition Date***"), the Borrower commenced Chapter 11 Case No. 16-31521 (the "***Chapter 11 Case***") by filing a voluntary petition for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "***Bankruptcy Code***"), with the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***").  The Borrower continues to operate its business and manage its properties as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, Amegy Bank National Association ("***Amegy***") provided financing to the Borrower pursuant to that certain Credit Agreement dated as of July 15, 2010 among the Borrower, Amegy, as administrative agent and the lenders party thereto (as amended, modified or supplemented through the Petition Date, the "***Pre-Petition Credit Agreement***");

WHEREAS, the Borrower has requested that the Lenders party hereto provide a secured revolving debtor-in-possession credit facility to Borrower in the maximum amount of $8,000,000 in the aggregate to be used for the purposes set forth in Section 6.12;

WHEREAS, in order to secure the Obligations of the Borrower and the Guarantors (as hereinafter defined) under the Loan Documents, the Borrower and the Guarantors will grant to the Agent, for the benefit of the Agent and all Lenders, a security interest in and lien upon substantially all of the now existing and hereafter acquired personal and real property of the Borrower and Guarantors, respectively, including, without limitation, all present and future equity interests of the Subsidiaries of the Borrower and the Guarantors;

WHEREAS, the relative priority of the Liens and security interests granted to secure the Obligations in relation to the Liens and security interests securing the Prior Lender Obligations and certain other obligations will be set forth in the Interim Order and the Final Order (in each case, as hereinafter defined);

WHEREAS, the Borrower and the Guarantors will provide to Amegy under the Pre-Petition Credit Agreement and the "Loan Documents" (as defined therein) adequate protection;

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

### 1.01   Defined Terms.

As used in this Agreement, the terms defined in the introductory paragraph hereof shall have the meanings therein indicated and the following terms shall have the meanings set forth below:

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

***Administrative Agent*** means Haddington Energy Partners IV, LP in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

***Administrative Agent's Office*** means the Administrative Agent's address and, as appropriate, account as set forth on ***Schedule 10.02***, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

***Administrative Details Form*** means the Administrative Details Reply Form or comparable form furnished by a Lender to the Administrative Agent in connection with this Agreement.

***Administrator*** has the meaning specified in ***Section 10.16(b)(ii)***.

***Affiliate*** means, as to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to be controlled by any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding the foregoing, the Haddington Entities will not be considered Affiliates of any Loan Party for purposes of any Loan Document.

***Agent-Related Persons*** means the Administrative Agent (including any successor administrative agent) and their respective Affiliates (including the officers, directors, employees, agents and attorneys-in-fact of such Person).

***Aggregate Revolving Commitment*** means collectively the Revolving Commitments of all the Lenders which as of the Closing Date is $8,000,000, as such amount may be adjusted from time to time in accordance with this Agreement.

***Agreement*** means this Debtor-In-Possession Credit Agreement, as it may from time to time be amended, modified, supplemented or restated.

***Amegy*** has the meaning assigned to such term in the recitals hereto.

***Assignment and Assumption*** means an Assignment and Assumption substantially in the form of ***Exhibit D***.

***Attorney Costs*** means and includes the reasonable fees and disbursements of any law firm or other external counsel.

***Attributable Indebtedness*** means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

***Authorizations*** means all filings, recordings, and registrations with, and all validations or exemptions, approvals, orders, authorizations, consents, franchises, licenses, certificates, and permits from, any Governmental Authority.

***Bankruptcy Court*** shall have the meaning assigned to such term in the recitals hereto.

2

**Error! Unknown document property name.**

**Basis points** or **bps** means for one Basis Point, 1/100[th] of 1%.

**Board** means the Board of Governors of the Federal Reserve System of the United States.

**Borrower** has the meaning set forth in the introductory paragraph hereto.

**Borrowing** means a borrowing consisting of simultaneous Revolving Loans made by each of the Lenders pursuant to **Section 2.01**.

**Borrowing Notice** means a notice of a Borrowing.

**Budget** means the aggregate, without duplication, of all items approved by the Lenders in their reasonable judgment that are set forth in the budget attached to the Interim Order, as modified or supplemented from time to time by additional budgets to which the Borrower and the Administrative Agent mutually agree.

**Business Day** means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of Texas or the Laws of the U.S., or are in fact closed.

**Business Plan** means the Borrower's business plan for the "warm idling" of the [plant][1] which shall include a financial forecast of the estimated expenses for such business plan prepared by Borrower's management.

**Capital Expenditure** by a Person means an expenditure (determined in accordance with GAAP and including for Maintenance CapEx and growth) for any fixed asset owned by such Person for use in the operations of such Person having a useful life of more than one year, or any improvements or additions thereto.

**Capital Lease** means any capital lease or sublease which should be capitalized on a balance sheet in accordance with GAAP; *provided, however,* regardless of whether they should be capitalized on the Borrower's balance sheet or not, the Borrower's transportation and operating agreements with Texana Midstream Company, LP shall not be considered a Capital Lease for purposes of this Agreement.

**Carve-Out** shall have the meaning assigned to it in the Interim Order or the Final Order, as applicable, and which, in any event shall carve-out from the of the Obligations (i) so long as no Event of Default has occurred, allowed professional fees and expenses in the Chapter 11 Case, (ii) following an Event of Default, allowed professional fees and expenses in the Chapter 11 Case in an aggregate amount not to exceed an amount to be determined and (iii) United States Trustee's fees pursuant to 28 U.S.C. § 1930(a)(6).

**Cash Equivalents** means:

(a)　　United States Dollars;

(b)　　direct general obligations, or obligations of, or obligations fully and unconditionally guaranteed as to the timely payment of principal and interest by, the United States or any agency or instrumentality thereof having remaining maturities of not more than

---

[1] NTD: To discuss whether more detail is appropriate here.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

twelve (12) months, but excluding any such securities whose terms do not provide for payment of a fixed dollar amount upon maturity or call for redemptions;

(c)     demand deposits and time deposits (including certificates of deposit) maturing within twelve (12) months from the date of deposit thereof with any office of any Lender;

(d)     repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in (b) and (c) above entered into with any financial institution meeting the qualifications in (c) above;

(e)     commercial paper (maturing within two hundred seventy (270) days) after acquisition thereof, rated "P-1" or better by Moody's or "A-1" or the equivalent by S&P; and

(f)     money market or other mutual funds (i) rated AA or better by S&P or (ii) substantially all of the assets of which comprise securities of the types described in subsections (a) through (e) above.

***CERCLA*** has the meaning set forth in the defined term "Environmental Law."

***Change of Control*** means (a) any Person, entity or group (other than one or more of the Haddington Entities or an Affiliate of a Haddington Entity or the investors that purchased the Specified Preferred Equity or any Affiliates of such purchasers) acquires beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934) of 51% or more of the equity interests in the Parent, (b) the Parent ceases to own 100% of the equity interest in the Borrower, or (c) the Borrower shall fail to own, directly or indirectly, 100% of the equity interest in any Subsidiary.

***Change in Law*** means (a) the adoption of any Law, rule or regulation after the date of this Agreement, (b) any change in any Law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 3.04(b), by any Lending Office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

***Chapter 11 Case*** shall have the meaning assigned to such term in the recitals hereto.

***Closing Date*** means the first date all the conditions precedent in ***Section 4.01*** and ***Section 4.02*** are satisfied or waived (or, in the case of ***Sections 4.01(h)*** and ***(i)***, waived by the Person entitled to receive the applicable payment).

***Code*** means the Internal Revenue Code of 1986.

***Collateral*** means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a Lien now or hereafter exists in favor of the Secured Parties, or the Administrative Agent on behalf of the Secured Parties, including, but not limited

4

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

to substantially all of the assets (including stock and other equity interests) of each Loan Party, whether under this Agreement or under any other document executed by a Loan Party and delivered to the Administrative Agent or any Secured Party, except as provided herein, and including, without limitation of the foregoing, subject to the entry of the Final Order, avoidance actions of the Borrower under Chapter 5 of the Bankruptcy Code. Collateral does not include any Excluded Assets.

*Compensation Period* has the meaning set forth in *Section 2.10(e)(ii)*.

*Contractual Obligation* means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

*Credit Extension* means a Borrowing.

*Debtor Relief Laws* means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

*Default* means any event or condition that constitutes an Event of Default or any event that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

*Default Rate* means an interest rate equal to two percent (2.00%) per annum above the per annum rate otherwise applicable to the Revolving Loans, to the fullest extent permitted by applicable Laws.

*Defaulting Lender* means any Lender that (a) has failed to fund any portion of the Revolving Loans required to be funded by it under this Agreement within one Business Day of the date required to be funded by it under this Agreement, (b) has otherwise failed to pay over to Administrative Agent or any other Lender any other amount required to be paid by it under this Agreement within one Business Day of the date when due, unless the subject of a good faith dispute, or (c) has instituted or consented to the institution of any proceeding for it or a material part of its property under any Debtor Relief Law.

*Disposition* or *Dispose* means the sale, transfer, license or other disposition (including any sale and leaseback transaction) of any property (including stock, partnership and other equity interests) by any Person of property owned by such Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith (excluding, in each case, any sale of inventory or other property in the ordinary course of business or of any obsolete or worn out property). For the avoidance of doubt, a Restricted Payment is not a Disposition.

*Dispute* has the meaning specified in *Section 10.16(b)(i)*.

*Dollar* and *$* means lawful money of the United States.

*Domestic Person* means any corporation, general partnership, limited partnership, limited liability partnership, or limited liability company that is organized under the Laws of the United States or any state thereof or the District of Columbia.

*Eligible Assignee* means Haddington Energy Partners IV, L.P., a Delaware limited partnership and any Affiliate of a Lender.

5

**Error! Unknown document property name.**

**Environmental Law** means any applicable Law that relates to (a) the condition or protection of air, groundwater, surface water, soil, or other environmental media, (b) the environment, including natural resources or any activity which affects the environment, (c) the regulation of any pollutants, contaminants, wastes, substances, and Hazardous Substances, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (*42 U.S.C. §9601 et seq.*) ("*CERCLA*"), the Clean Air Act (*42 U.S.C. § 7401 et seq.*), the Federal Water Pollution Control Act, as amended by the Clean Water Act (*33 U.S.C. § 1251 et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (*7 U.S.C. § 136 et seq.*), the Emergency Planning and Community Right to Know Act of 1986 (*42 U.S.C. § 1100 1 et seq.*), the Hazardous Materials Transportation Act (*49 U.S.C. § 1801 et seq.*), the National Environmental Policy Act of 1969 (*42 U.S.C. § 4321 et seq.*), the Oil Pollution Act (*33 U.S.C. § 2701 et seq.*), the Resource Conservation and Recovery Act (*42 U.S.C. § 6901 et seq.*) ("*RCRA*"), the Rivers and Harbors Act (*33 U.S.C. §401 et seq.*), the Safe Drinking Water Act (*42 U.S.C. § 201 and § 300f et seq.*), the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984 (*42 U.S.C. § 6901 et seq.*), the Toxic Substances Control Act (*15 U.S.C. § 2601 et seq.*), and analogous state and local Laws, as any of the foregoing may have been and may be amended or supplemented from time to time, and any analogous enacted or adopted Law, or (d) the Release or threatened Release of Hazardous Substances.

**ERISA** means the Employee Retirement Income Security Act of 1974.

**ERISA Affiliate** means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of *Section 414(b)* or *(c)* of the Code (and *Sections 414(m)* and *(o)* of the Code for purposes of provisions of this Agreement relating to obligations imposed under *Section 412* of the Code).

**ERISA Event** means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by Borrower or any ERISA Affiliate from a Pension Plan subject to *Section 4063* of ERISA during a plan year in which it was a substantial employer (as defined in *Section 4001(a)(2)* of ERISA) or a cessation of operations that is treated as such a withdrawal under *Section 4062(e)* of ERISA; (c) a complete or partial withdrawal by Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under *Sections 4041* or *4041A* of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which might reasonably be expected to constitute grounds under *Section 4042* of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under *Title IV* of ERISA, other than PBGC premiums due but not delinquent under *Section 4007* of ERISA, upon Borrower or any ERISA Affiliate.

**Eustace System** means that certain gas gathering and transportation system located in six Texas counties, comprised as of the date hereof of approximately 371 miles of gathering and transportation pipelines, 5 compressor stations, 1 gas processing and treating plant, 1 condensate sweetening plant, 2 idle processing facilities and 1 idle fractionation tower, acquired by Borrower in 2010.

**Event of Default** means any of the events or circumstances specified in ***Article VIII***.

**Excluded Assets** means any contracts, agreements or permits as to which the granting of a security interest in same would cause a default, termination or penalty thereunder or under any applicable requirement of a Governmental Authority.

**Federal Funds Rate** means, for any day, the rate per annum (rounded upwards to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with

6

Tristream East Texas, LLC
DIP Credit Agreement

members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

**Final Order** means the orders of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which orders shall be satisfactory in form and substance to the Administrative Agent, and which orders are in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, provides for the of the Administrative Agent's claims and authorizes the use of cash collateral.

**First Day Orders** means orders entered by the Bankruptcy Court on the following motions: (i) Emergency Motion for Authority to Pay Prepetition Wages and Salaries, Reimburse Prepetition Employee Business Expenses, Pay other Prepetition Employee Benefits, and to Continue Benefit Programs in the Ordinary Course of Business; (ii) Debtor's Emergency Motion to (1) Approve Maintenance of Pre-petition Bank Accounts and (2) Continue Use of Existing Checks and Business Forms; (iii) Emergency Motion for Extension of Time to File Schedules and Statements of Financial Affairs; (iv) Emergency Motion for Order (1) Deeming Utilities Adequately Assured of Future Performance and (2) Establishing Procedures for Determining Requests for Additional Adequate Assurance Pursuant to Bankruptcy Code Section 366 and (v) Emergency Motion for Interim and Final Orders (1) Authorizing Use of Cash Collateral and Granting Adequate Protection, (2) Authorizing Postpetition Financing, and (3) granting relief.

**Foreign Lender** means any Lender that is organized under the Laws of a jurisdiction other than that in which Borrower is resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

**GAAP** means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board and the Public Company Accounting Oversights Board or such other principles as may be approved by a significant segment of the accounting profession, that are applicable to the circumstances as of the date of determination, consistently applied.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided that*, until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**Governmental Authority** means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

bank or other legal entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

*Guarantors* means every present and future Subsidiary of the Borrower, and each other Person which undertakes to be liable for all or any part of the Obligations by execution of a guaranty, or otherwise.

*Guaranty Obligation* means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other payment obligation of another Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other payment obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other payment obligation of the payment of such Indebtedness or other payment obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other payment obligation, or (iv) entered into for the purpose of assuring in any other manner the obligees in respect of such Indebtedness or other payment obligation of the payment thereof or to protect such obligees against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other payment obligation of any other Person, whether or not such Indebtedness or other payment obligation is assumed by such Person; *provided, however*, that the term "*Guaranty Obligation*" shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guaranty Obligation shall be deemed to be the lesser of (a) an amount equal to the stated or determinable outstanding amount of the related primary obligation and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranty Obligation, unless the outstanding amount of such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of such Guaranty Obligation shall be the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

*Haddington Entity* means individually Haddington Energy Partners III, LP, a Delaware limited partnership, Haddington Energy Partners IV, LP, a Delaware limited partnership, HEP IV Co-Invest LP, a Delaware limited partnership, Tristream Co-Invest LP, a Delaware limited partnership, Tristream Co-Invest II LP, a Delaware limited partnership, and Tristream Co-Invest III LP, a Delaware limited partnership, each of which owns membership interests in the Parent and the direct and indirect owners thereof.

*Hazardous Substance* means any substance that poses a threat to, or is regulated to protect, human health, safety, public welfare, or the environment, including without limitation: (a) any "hazardous substance," "pollutant" or "contaminant," and any "petroleum" or "natural gas liquids" as those terms are defined or used under *Section 101* of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ( *42 U.S.C. §§ 9601 et seq.*), (b) "solid waste" as defined by the federal Solid Waste Disposal Act (*42 U. S.C. § § 6901 et seq.*), (c) asbestos or a material containing asbestos, (d) any material that contains lead or lead-based paint, (e) any item or equipment that contains or is contaminated by polychlorinated biphenyls, (f) any radioactive material, (g) urea formaldehyde, (h) putrescible materials, (i) infectious materials, (j) toxic microorganisms, including mold, or (k) any substance the presence or Release of which requires reporting, investigation or remediation under any Environmental Law.

*Hydrocarbons* means crude oil, condensate, natural gas, natural gas liquids, coal bed methane and other hydrocarbons and all products refined or separated therefrom.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**Impacted Lender** means a Defaulting Lender or a Lender as to which an entity that controls such Lender has instituted or consented to the institution of any proceeding for it or a material part of its property under any Debtor Relief Law.

**Indebtedness** means, as to any Person at a particular time, all of the following:

> (a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

> (b)    the face amount of all letters of credit (including standby and commercial), banker's acceptances, surety bonds, and similar instruments issued for the account of such Person, and, without duplication, all drafts drawn and unpaid thereunder;

> (c)    all obligations of such Person to pay the deferred purchase price of property or services, other than trade accounts payable in the ordinary course of business not overdue by more than 90 days, and Indebtedness of others (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person, whether or not such Indebtedness shall have been assumed by such Person or is limited in recourse;

> (d)    all obligations of such Person under conditional sales or other title retention agreements relating to property acquired by such Person;

> (e)    Capital Leases and Synthetic Lease Obligations of such Person; and

> (f)    all Guaranty Obligations of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any Capital Lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.  In addition, the determination of Indebtedness of the Borrower and its Subsidiaries shall be made on a consolidated basis without taking into account any Indebtedness owed by any such Person to any other such Person.  For the avoidance of doubt, it is agreed that none of the Specified Preferred Equity shall be deemed to be Indebtedness of any Loan Party.

**Indemnified Liabilities** has the meaning set forth in *Section 10.05*.

**Indemnitees** has the meaning set forth in *Section 10.05*.

**Interest Payment Date** means the last Business Day of each quarter during the term of this Agreement and the Maturity Date, as the case may be.

**Interim Order** means the orders of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents [and pay all [Pre-Petition Indebtedness] under the Pre-Petition Credit Agreement and the other obligations to be paid on the Closing Date as contemplated by Section 6.12].

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**Investment** means, as to any Person, any acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, guaranty of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, less all returns of principal or equity thereon, and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an amount equal to the fair market value of such property.

**IRS** means the United States Internal Revenue Service.

**Laws** means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, licenses, authorizations and permits of, any Governmental Authority.

**Lender** and **Lenders** have the meanings set forth in the introductory paragraph hereto.

**Lending Office** means, as to any Lender, the office or offices of such Lender set forth on its Administrative Details Form, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

**Lien** means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever to secure or provide for payment of any obligation of any Person (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction, other than any financing statement filed as a notice filing), including the interest of a purchaser of accounts receivable.

**Loan Documents** means this Agreement, each Revolving Note, each written Borrowing Notice, and each other agreement, document or instrument delivered by any Loan Party or any of its Subsidiaries from time to time in connection with this Agreement and the Revolving Notes.

**Loan Party** means each of the Parent, Borrower and each Guarantor.

**Maintenance CapEx** means Capital Expenditures by Borrower or any Subsidiary necessary to maintain current services associated with the gathering, transportation, processing and treating of throughput volumes of natural gas from wells currently supplying the Eustace System.

**Material Adverse Effect** means, in each case, other than the filing of the Chapter 11 Case: (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Borrower and its Subsidiaries taken as a whole; (b) a material adverse effect on the ability of any Loan Party to perform its obligations under the Loan Documents to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against Borrower or any other Loan Party of any Loan Documents.

10

Error! Unknown document property name.

**Material Contract** means any agreement now or hereafter entered into between Borrower or any of its Subsidiaries and any producer of oil and/or gas for the gathering, transportation, fractionation, processing, treating, marketing, or storage of natural gas, crude oil and/or natural gas liquids where the amount to be earned by the Borrower exceeds $1,000,000 annually and **Material Contracts** means collectively all of such Material Contracts.

**Maturity Date** means the earliest of (a) the date that is [_____] after the Petition Date, (b) the date of termination of Lenders' obligations to make Loans or permit existing Loans to remain outstanding pursuant to Section 8.02, (c) the date of indefeasible payment in full by the Borrower of the Loans and the permanent reduction of all Revolving Commitments to zero dollars ($0), (d) [___] days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (f) the close of business on the first Business Day after the entry of the Final Order, if by that time, the Borrower has not paid Administrative Agent the fees required under the Fee Letter, unless Administrative Agent agrees otherwise and (g) the effective date of the plan of reorganization in the Chapter 11 Case.

**Maximum Amount** and **Maximum Rate** respectively mean, for each Lender, the maximum non-usurious amount and the maximum non-usurious rate of interest which, under applicable Law, such Lender is permitted to contract for, charge, take, reserve, or receive on the Obligations.

**Midstream Business** means gathering, transportation, fractionation, processing, marketing, and storage of natural gas, crude oil, sulfur, natural gas liquids and other liquid and gaseous hydrocarbons and businesses closely related to the foregoing.

**Moody's** means Moody's Investors Service, Inc.

**Multiemployer Plan** means any employee benefit plan of the type described in *Section 4001(a)(3)* of ERISA, to which Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding three calendar years, has made or been obligated to make contributions.

**Non-Primed Liens** [TO COME]

**Obligations** means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest that accrues after the commencement of the Chapter 11 Case.

**Organization Documents** means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate of formation and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation with the secretary of state or other department in the state of its formation, in each case as amended from time to time.

**Other Taxes** has the meaning specified in *Section 3.01(b)*.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

**Outstanding Amount** on any date, with respect to Revolving Loans, means the aggregate principal amount thereof after giving effect to any Borrowings and prepayments or repayments occurring on such date.

**Parent** means Tristream Energy, LLC, a Delaware limited liability company.

**Participant** has the meaning specified in **Section 10.07(d)**.

**PBGC** means the Pension Benefit Guaranty Corporation.

**Pension Plan** means any "*employee pension benefit plan*" (as such term is defined in *Section 3(2)(A)* of ERISA), other than a Multiemployer Plan, that is subject to *Title IV* of ERISA and is sponsored or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer plan (as described in *Section 4064(a)* of ERISA) has made contributions at any time during the immediately preceding five plan years.

**Permitted Liens** means Liens permitted under *Section 7.01* as described in such Section.

**Person** means any individual, trustee, corporation, general partnership, limited partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association, firm, joint venture or Governmental Authority.

**Petition Date** has the meaning assigned to such term in the recitals hereto.

**PIK Interest** shall have the meaning assigned to such term in Section 2.06(a).

**Plan** means any "*employee benefit plan*" (as such term is defined in *Section 3(3)* of ERISA) established by Borrower or any ERISA Affiliate.

**Post-Petition** means the time period beginning immediately upon filing of the Chapter 11 Case.

**Post-Petition Guaranty** means any guaranty entered into by any Loan Party after the filing of the Chapter 11 Case.

**Post-Petition Indebtedness** means any or all Indebtedness of the Loan Parties incurred after the filing of the Chapter 11 Case.

**Pre-Petition Credit Agreement** shall have the meaning assigned to such term in the recitals hereto.

**Pre-Petition Letters of Credit** means the letters of credit issued and outstanding on the Closing Date under the Pre-Petition Credit Agreement.

**Pre-Petition Loan Documents** shall have the meaning assigned to "Loan Documents" in the Pre-Petition Credit Agreement.

**Pre-Petition Loans** shall mean the aggregate "Revolving Loans" (as such term is defined in the Pre-Petition Credit Agreement) outstanding on the Petition Date.

**Prior Agent** shall mean the "Administrative Agent" under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, including, without limitation, in its capacity as the holder of the

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

Liens created under the security documents and mortgages delivered pursuant to the Pre-Petition Credit Agreement.

*Prior Lender Obligations* means "Obligations" under and as such term is defined in the Pre-Petition Credit Agreement.

*Prior Lenders* means the Lenders under the Pre-Petition Credit Agreement.

*Pro Rata Share* means, at any date of determination, for any Lender, the percentage (carried out to the ninth decimal place) that its Revolving Commitment bears to the Aggregate Revolving Commitment.

*RCRA* has the meaning set forth in the defined term "Environmental Law."

*Register* has the meaning set forth in *Section 10.07(c)*.

*Regulation U* means Regulation U of the Board.

*Related Parties* means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees and agents of such Person and such Person's Affiliate.

*Related Transaction* means the initial borrowing of the Revolving Loans on the Closing Date and the payment of all Fees, costs and expenses associated with all of the foregoing and the execution and delivery of all of the Related Transaction Documents.

*Related Transaction Documents* means the Loan Documents, and all other agreements or instruments executed in connection with the Related Transaction.

*Release* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposal, deposit, dispersal, migrating, or other movement into the air, ground, or surface water, or soil.

*Reportable Event* means any of the events set forth in *Section 4043(c) of ERISA*, other than events for which the 30 day notice period has been waived.

*Request for Credit Extension* means, with respect to a Borrowing of Revolving Loans, a Borrowing Notice.

*Required Lenders* means, as of any date of determination (i) if there are two Lenders, Lenders having more than 75% of the Aggregate Revolving Commitment or, if the Revolving Commitment of each Lender to make Revolving Loans have been terminated pursuant to *Section 8.02*, Lenders holding in the aggregate more than 75% of the sum of the Outstanding Amount of all Revolving Loans, and (ii) if there are more than two Lenders, Lenders having more than 66+2/3% of the Aggregate Revolving Commitment or, if the Revolving Commitment of each Lender to make Revolving Loans have been terminated pursuant to *Section 8.02*, Lenders holding in the aggregate more than 66+2/3% of the sum of the Outstanding Amount of all Revolving Loans; *provided that* the Revolving Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

*Repayment Notice* means a notice of repayment of a Borrowing pursuant to *Section 2.03*, which, if in writing, shall be substantially in the form of *Exhibit A-3*.

**Responsible Officer** means the president, chief executive officer, executive vice president, senior vice president, vice president, chief financial officer, controller or treasurer of a Person.  Any document delivered to Administrative Agent hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership, limited liability company, and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

**Restricted Payment** by a Person means any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interest in such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity interest or of any option, warrant or other right to acquire any such equity interest.

**Revolving Commitment** means as to each Lender, its obligation to make Revolving Loans to Borrower pursuant to **Section 2.01** in an aggregate principal amount at any one time outstanding not to exceed the amount set out opposite such Lender's name on the most recently supplemented **Schedule 2.01**, or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

**Revolving Commitment Fee** has the meaning set forth in **Section 2.07(a)**.

**Revolving Loan** means an extension of revolving credit by a Lender to Borrower pursuant to **Section 2.01**.

**Revolving Note** means a revolving promissory note of the Borrower in substantially the form of **Exhibit B**, evidencing the obligation of the Borrower to repay the Revolving Loans and all renewals and extensions of all or any part thereof and "**Revolving Notes**" collectively means all of such promissory notes.

**Rights** means rights, remedies, powers, privileges, and benefits.

**S&P** means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

**Secured Parties** means the Agent and the Lender(s).

**Specified Preferred Equity** means the Class A Preferred Units and Class C Units issued and sold by the Parent in accordance with the terms of its Third Amended and Restated Limited Liability Company Agreement, dated on or around July 16, 2014.

**Subsidiary** of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

**Synthetic Lease Obligation** means the monetary obligation of a Person under (a) a so-called synthetic or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which are depreciated for tax purposes by such Person.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

*Taxes* has the meaning set forth in *Section 3.01(a)*.

*Total Outstandings* means the aggregate Outstanding Amount of all Revolving Loans.

*UCC* means the Uniform Commercial Code as in effect in the State of Texas.

*Unfunded Pension Liability* means the excess of a Pension Plan's benefit liabilities under *Section 4001(a)(16)* of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to *Section 412* of the Code for the applicable plan year.

*United States* or *U.S.* means the United States of America, its fifty states and the District of Columbia.

*USA Patriot Act* means Title III of Pub. L. 107-56 (signed into law October 26, 2001).

*Voting Stock* means the capital stock (or equivalent thereof) of any class or kind, of a Person, the holders of which are entitled to vote for the election of directors, managers, or other voting members of the governing body of such Person.

*Wholly-Owned* when used in connection with a Person means any Subsidiary of such Person of which all of the issued and outstanding equity interests (*except* shares required as directors' qualifying shares) shall be owned by such Person or one or more of its Wholly-Owned Subsidiaries.

**1.02   Other Interpretive Provisions**.

(a)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      (i)      The words "*herein*" and "*hereunder*" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)      Unless otherwise specified herein, Article, Section, Exhibit and Schedule references are to this Agreement.

(iii)      The term "*including*" is by way of example and not limitation.

(iv)      The term "*documents*" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced.

(c)      In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*;" the words "*to*" and "*until*" each mean "*to but excluding*;" and the word "*through*" means "*to and including*."

(d)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03   Accounting Terms**. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

time to time, applied in a manner consistent with that used in preparing the audited financial statements, except as otherwise specifically prescribed herein.

**1.04**   **Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05**   **References to Agreements and Laws**.  Unless otherwise expressly provided herein, (a) references to agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

## ARTICLE II.
## THE REVOLVING COMMITMENTS AND BORROWINGS

**2.01**   **Revolving Loans**.  Subject to and in reliance upon the terms, conditions, representations, and warranties in the Loan Documents, each Lender severally, but not jointly, agrees to make revolving loans (each such revolving loan a "***Revolving Loan***") to Borrower from time to time on any Business Day following the Closing Date in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Commitment as set forth on ***Schedule 2.01; provided,*** that after giving effect to any Borrowing, (a) the Total Outstandings shall not exceed the Aggregate Revolving Commitments (without giving effect to any fees or PIK Interest added to the Outstanding Amount of the Revolving Loans), and (b) the aggregate Outstanding Amount of the Revolving Loans of any Lender shall not exceed such Lender's Revolving Commitment (without giving effect to any fees or PIK Interest added to the Outstanding Amount of the Revolving Loans).  Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, Borrower may borrow under this ***Section 2.01***, prepay under ***Section 2.03***, and reborrow under this ***Section 2.01***.

**2.02**   **[Reserved]**.

**2.03**   **Prepayments**.

(a)   <u>Optional Prepayments</u>.  The Borrower may, upon delivery of a Repayment Notice to the Administrative Agent, at any time or from time to time voluntarily prepay in whole or in part Revolving Loans without premium or penalty; *provided* that (i) such notice must be received by the Administrative Agent not later than noon, Houston time the date of prepayment of such Revolving Loans; and (ii) any prepayment shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof. Each such notice shall specify the date and amount of such prepayment of Revolving Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of such Lender's Pro Rata Share of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Revolving Loan shall be accompanied by all accrued interest thereon.  Each such prepayment shall be applied to the Revolving Loans of the Lenders in accordance with their respective Pro Rata Shares.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(b)      Mandatory Payments/Reductions.  If for any reason the Outstanding Amount of all Revolving Loans at any time exceeds the Aggregate Revolving Commitment then in effect, the Borrower shall immediately prepay Revolving Loans in an aggregate amount equal to such excess.

(c)      Prepayments: Interest/Consequential Loss.  All prepayments under this **Section 2.03** shall be made together with accrued interest to the date of such prepayment on the principal amount prepaid.

**2.04      Reduction or Termination of Aggregate Revolving Commitments**.  The Borrower may, upon notice to the Administrative Agent, terminate the Aggregate Revolving Commitment or permanently reduce the Aggregate Revolving Commitment to an amount not less than the sum of the Outstanding Amount of the then existing unpaid principal balance of the Revolving Loans; *provided that* (i) any such notice shall be received by the Administrative Agent not later than noon, on the date of termination or reduction, and (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof.  The Administrative Agent shall promptly notify the Lenders of any such notice of reduction or termination.  Once reduced in accordance with this Section, the Aggregate Revolving Commitment may not be increased.  Any reduction of the Aggregate Revolving Commitment shall be applied to the Revolving Commitment of each Lender according to its Pro Rata Share.  Except in connection with a termination or reduction of the entire Aggregate Revolving Commitment, all Revolving Commitment fees on the portion of the Aggregate Revolving Commitment so terminated which have accrued to the effective date of any termination of the Aggregate Revolving Commitment shall, at Administrative Agent's option, either be paid on the effective date of such termination or on the date when such Revolving Commitment fee would otherwise be due.

**2.05      Repayment of Revolving Loans**.  The Borrower shall repay to the Lenders on the Maturity Date, the aggregate principal amount of Revolving Loans outstanding on such date.

**2.06      Interest**.

(a)      Except as provided in Section 2.06(b), all Obligations pursuant to the terms hereof shall bear interest at a rate equal to 18.00% per annum; provided that unless the Borrower makes the interest payment in cash prior to the applicable Interest Payment Date, the Borrower shall have been deemed to have elected to pay such interest as payable-in-kind ("**PIK Interest**") which shall be capitalized on each Interest Payment Date by adding such amount to the Outstanding Amount of the Revolving Loans.

(b)      While any Event of Default exists or after acceleration (i) the Borrower shall pay interest on the principal amount of all outstanding Obligations at a fixed interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law but in no event to exceed the Maximum Rate, and (ii) accrued and unpaid interest on past due amounts (including interest on past due interest, to the extent allowed by Law) shall be due and payable daily and upon demand.

(c)      Interest on each Revolving Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.

(d)      If the designated rate applicable to any Borrowing exceeds the Maximum Rate, the rate of interest on such Borrowing shall be limited to the Maximum Rate, but any subsequent reductions in such designated rate shall not reduce the rate of interest thereon below the Maximum Rate until the total amount of interest accrued thereon equals the amount of interest which would have accrued thereon if such designated rate had at all times been in effect.  In the event that at maturity (stated or by acceleration), or at final payment of the Outstanding Amount of any Revolving Loans, the total amount of interest paid or accrued is less than the amount of interest which would have accrued if such designated rates had at all times been in effect, then, at such time and to the extent permitted by Law, the Borrower

17                                    Tristream East Texas, LLC
                                              DIP Credit Agreement

shall pay an amount equal to the difference between (a) the lesser of the amount of interest which would have accrued if such designated rates had at all times been in effect and the amount of interest which would have accrued if the Maximum Rate had at all times been in effect, and (b) the amount of interest actually paid or accrued on such Outstanding Amount.

**2.07     Fees.** Administrative Agent's Upfront Fee. On the Closing Date, the Borrower shall pay to each Lender a non-refundable fee equal to two percent (2.00%) of the aggregate principal amount of such Lender's Revolving Commitment under this agreement; *provided*, that such fee shall not be paid in cash but shall instead be paid by adding such amount to the Outstanding Amount of the Revolving Loans. Such fees shall be fully earned when paid and shall be nonrefundable for any reason whatsoever.

**2.08     Computation of Interest and Fees.** Computation of interest on Revolving Loans shall be calculated on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed. Computation of all other types of interest and all fees shall be calculated on the basis of a year of 360 days and the actual number of days elapsed, which results in a higher yield to the payee thereof than a method based on a year of 365 or 366 days. Interest shall accrue on each Revolving Loan for the day on which the Revolving Loan is made, and shall not accrue on a Revolving Loan, or any portion thereof, for the day on which the Revolving Loan or such portion is paid; *provided* that any Revolving Loan that is repaid on the same day on which it is made shall bear interest for one day.

**2.09     Evidence of Debt.** (a) The Revolving Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Revolving Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure so to record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Revolving Loans. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of such Lender shall control, absent manifest error. Upon the request of any Lender made through the Administrative Agent, such Lender's Revolving Loans may be evidenced by one or more Revolving Notes. Thereafter, the Revolving Loans evidenced by such Revolving Note and interest thereon shall at all times (including after assignment pursuant to *Section 10.07*) be represented by one or more Revolving Notes payable to the order of the payee named therein. Each Lender may attach schedules to its Revolving Note(s) and endorse thereon the date, amount and maturity of the applicable Revolving Loans and payments with respect thereto.

(b)      In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control.

**2.10     Payments Generally.** (a) All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than noon, Houston time, on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after noon, Houston time, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

(b)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    If no Event of Default exists and if no order of application is otherwise specified in the Loan Documents, payments and prepayments of the Obligations shall be applied first to fees, second to accrued interest then due and payable on the Outstanding Amount of Revolving Loans, and then to the remaining Obligations in the order and manner as the Administrative Agent may direct.

(d)    If at any time an Event of Default exists, any payment or prepayment shall be applied in the following order: (i) to the payment of enforcement expenses incurred by the Administrative Agent, including Attorney Costs; (ii) to the accrued and unpaid interest on, and principal of, the Outstanding Amount of Revolving Loans, on any date of determination; and (iii) to the payment of the remaining Obligations, if any, in the order and manner the Required Lenders deem appropriate.

(e)    Unless the Borrower or any Lender has notified the Administrative Agent prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

> (i)    if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds, at the Federal Funds Rate from time to time in effect; and

> (ii)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the Federal Funds Rate from time to time in effect.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Revolving Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Revolving Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender with respect to any amount owing under this subsection (e) shall be conclusive, absent manifest error.

(f)    If any Lender makes available to the Administrative Agent funds for any Revolving Loan to be made by such Lender as provided in the foregoing provisions of this *Article II*, and the conditions to the applicable Borrowing set forth in *Article IV* are not satisfied or waived in accordance with the terms

hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(g)     The obligations of the Lenders hereunder to make Revolving Loans are several and not joint.  The failure of any Lender to make any Revolving Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Revolving Loan or purchase its participation.

(h)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Revolving Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Revolving Loan in any particular place or manner.

**2.11    Sharing of Payments**. If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Revolving Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Revolving Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Revolving Loan pro rata with each of them; *provided, however*, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender, such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.

**2.12    [Reserved]**.

**2.13    [Reserved]**.

**2.14    [Reserved]**.

**2.15    Payment of Obligations**.

Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent, and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, in accordance with provisions of the Interim Order and the Final Order, as applicable.

**ARTICLE III.**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

**3.01    Taxes**.

(a)     Any and all payments by the Borrower to or for the account of the Administrative Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto; *excluding*, in the case of the Administrative Agent

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

and each Lender, taxes imposed on or measured by its net income (including any franchise taxes imposed on or measured by its net income), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Administrative Agent or such Lender, as the case may be, is organized or maintains its Lending Office (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities being hereinafter referred to as "***Taxes***").  If the Borrower shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section), each of the Administrative Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws.

(b)     In addition, the Borrower agrees to pay any and all present or future stamp, mortgage, court or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (hereinafter referred to as "***Other Taxes***").

(c)     If the Borrower shall be required to deduct or pay any Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, the Borrower shall also pay to the Administrative Agent (for the account of such Lender) or to such Lender, at the time interest is paid, such additional amount that such Lender specifies as necessary to preserve the after-tax yield (after factoring in all taxes, including taxes imposed on or measured by net income) such Lender would have received if such Taxes or Other Taxes had not been imposed.

(d)     The Borrower agrees to indemnify the Administrative Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section) paid by the Administrative Agent and such Lender, and (ii) amounts payable under ***Section 3.01(c)*** and (iii) any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, except to the extent such sums are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent or such Lender, as applicable.  Payment under this subsection (d) shall be made within 30 days after the date the Lender or the Administrative Agent makes a demand therefor.

(e)     As soon as practicable after any payment of indemnified Taxes or Other Taxes by Borrower to a Governmental Authority, Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the Law of the jurisdiction in which Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law, or reasonably requested by Borrower, as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of IRS Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(ii)     duly completed copies of IRS Form W-8ECI;

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN; or

(iv)     any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower to determine the withholding or deduction required to be made.

**3.02     [Reserved].**

**3.03     [Reserved].**

**3.04     Increased Cost and Reduced Return; Capital Adequacy.**

(a)     [Reserved].

(b)     If any Lender determines a Change in Law has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender (with a copy of such demand to the Administrative Agent), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(c)     [Reserved].

(d)     Failure or delay on the part of any Lender demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased cost or reductions incurred 180 or more days prior to the date that such Lender makes demand therefor.

**3.05     [Reserved]**

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**3.06    Matters Applicable to all Requests for Compensation**.    A certificate of the Administrative Agent or any Lender claiming compensation under this Article III and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error.  In determining such amount, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods.

**3.07    Survival**.    All of the Borrower's obligations under this *Article III* shall survive termination of the Aggregate Revolving Commitment and payment in full of all the other Obligations except as otherwise set forth herein.

**3.08    Mitigation Obligations**.  If any Lender requests compensation under *Section 3.04*, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 3.01*, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Revolving Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to *Section 3.01* or *Section 3.04*, as the case may be, in the future and (ii) would not subject such Lender to any un-reimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.09    Replacement of Lenders**.  If (i) any Lender requests compensation under *Section 3.04*, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 3.01* or (ii) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, *Section 10.07*), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in *Section 10.07(b)(iii)*;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Revolving Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) such payment being at par, with no premium or discount;

(c)    in the case of any such assignment resulting from a claim for compensation under *Section 3.04*, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

23                          Tristream East Texas, LLC
                                                            DIP Credit Agreement

**Error! Unknown document property name.**

# ARTICLE IV.
## CONDITIONS PRECEDENT TO CREDIT EXTENSION

**4.01    Conditions Precedent**. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:.

(a)    The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles or electronic copies (followed promptly by originals) and unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or other Person party thereto, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date), and each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel:

(i)    executed counterparts of this Agreement;

(ii)    Revolving Notes executed by the Borrower in favor of each Lender requesting such Revolving Notes, each Revolving Note in a principal amount equal to such Lender's Revolving Commitment, and each Revolving Note;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of officers of each Loan Party as the Administrative Agent may require to establish the identities of and verify the authority and capacity of each officer thereof authorized to act in connection with this Agreement and the other Loan Documents to which such Loan Party is a party; and

(iv)    such evidence as the Administrative Agent may reasonably require to verify that each Loan Party is duly organized or formed, validly existing, and in good standing in the jurisdiction of its organization.

(b)    The Administrative Agent shall have received fully executed copies of the Related Transaction Documents, each of which shall be in full force and effect, in form and substance reasonably satisfactory to the Administrative Agent. The Related Transaction shall have been consummated in accordance with the terms of the Related Transaction Documents.

(c)    The Administrative Agent shall have received and be satisfied with (i) the Budget and (ii) the Business Plan.

(d)    No pleading or application seeking certain relief affecting the provision of this Agreement and the credit facilities provided hereunder on the terms set forth herein shall have been filed in Bankruptcy Court by any party in interest which is not withdrawn, dismissed or denied within [15] days after filing.

(e)    All First Day Orders entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Administrative Agent, other than the Interim Order which shall be acceptable to the Administrative Agent in its sole discretion.

(f)    There shall have occurred no material adverse change in the business, condition (financial or otherwise), operations, performance, properties, projections or prospects of the Borrower and Guarantors taken as a whole, other than any change of the type that customarily occurs as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(g)     [Reserved]

(h)     Any fees due and payable at the Closing Date shall have been paid or added to the Outstanding Amount of the Revolving Loans.

(i)     [Reserved].

(j)     The Administrative Agent's receipt (with sufficient copies for all Lenders) of the certificate of formation of the Borrower and each Subsidiary, together with all amendments, certified by an appropriate governmental officer in its jurisdiction of organization, as well as any other information required by Section 326 of the USA Patriot Act or necessary for the Administrative Agent or any Lender to verify the identity of Borrower as required by Section 326 of the USA Patriot Act.

(k)     All governmental and third-party approvals necessary or, in the discretion of the Administrative Agent, advisable in connection with the financing contemplated hereby and the continuing operations of the Borrower and its Subsidiaries shall have been obtained and be in full force and effect.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

**4.02    Conditions to all Credit Extensions**.    The obligation of each Lender to honor any Borrowing Notice for a Credit Extension is subject to the following conditions precedent:

(a)     The representations and warranties of the Loan Parties contained in *Article V*, or which are contained in any document furnished at any time under or in connection herewith shall be true and correct in all material respects on and as of the date such Revolving Loan is made except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

(b)     No Default shall exist or would result from such proposed Revolving Loan.

(c)     The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     The Administrative Agent shall have received, in form and substance reasonably satisfactory to it, such other assurances, certificates, documents or consents related to the foregoing as the Administrative Agent or the Required Lenders reasonably may require.

(e)     The Final Order, in form and substance satisfactory to the Administrative Agent shall not have been entered into the Bankruptcy Court [within [___] days after entry of the Interim Order] or such Final Order shall have been reversed, modified, amended or stayed.

(f)     No pleading or application seeking certain relief affecting the provision of this Agreement and the credit facilities provided hereunder on the terms set forth herein shall have been filed in Bankruptcy Court by any party in interest which is not withdrawn, dismissed or denied within [15] days after filing

Each Request for Credit Extension submitted by Borrower shall be deemed to be a representation and warranty that the conditions specified in *Sections 4.02(a)* and *(b)* have been satisfied on and as of the date of the applicable Credit Extension.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

**5.01    Existence; Qualification and Power; Compliance with Laws.**  Each Loan Party (a) is a corporation, partnership or limited liability company duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all governmental licenses, authorizations, consents and approvals to own its assets and carry on its business (except to the extent the failure to obtain such licenses, authorizations, consents and approvals could not be reasonably expected to cause a Material Adverse Effect) and to execute, deliver, and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license.

**5.02    Authorization; No Contravention.**  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not: (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, any Material Contract (other than the Liens created under the Loan Documents) to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its property is subject; or (c) violate any Law.

**5.03    Governmental Authorization.**  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority, except for (a)  filings to maintain the existence and foreign qualification of the Loan Parties (b) the filing of the Chapter 11 Case and (c) such as have been obtained or made and are in full force and effect (or the failure of which to obtain or make could not be reasonably expected to result in a Material Adverse Effect), is necessary or required in connection with the execution, delivery or performance by any Loan Party of this Agreement or any other Loan Document.

**5.04    Binding Effect.**  This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect.**

(a)      The financial statements delivered to the Lenders pursuant to ***Sections 6.01(a)*** and ***(b)*** have been prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.  Such financial statements: (i) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance in all material respects with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, subject in the case of quarterly financial statements delivered pursuant to ***Section 6.01(b)*** to year-end audit adjustments and the absence of footnotes; and (ii) show all material indebtedness and other

**Error! Unknown document property name.**

liabilities of the Borrower and its Subsidiaries as of the date thereof required to be reflected therein in accordance with GAAP consistently applied throughout the period covered thereby.

(b)     The Business Plan and the Budget delivered on or prior to the date hereof and the updated Budget delivered pursuant to Section 6.02(e) as of the date thereof were prepared or will be prepared, as applicable, in good faith and are based on reasonable assumptions.

(c)     Since Petition Date, there has been no event or circumstance that has or could reasonably be expected to have a Material Adverse Effect, other than the filing of the Chapter 11 Case.

**5.06     Litigation**.  Except as set forth on *Schedule 5.06*, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of their properties or revenues which (a) seek to affect or pertain to this Agreement or any other Loan Document, the borrowing of Revolving Loans, the use of the proceeds thereof, or (b) could reasonably be expected to have a Material Adverse Effect.

**5.07     No Default**.  As of the Closing Date, to Borrower's knowledge, other than as a direct result of the Chapter 11 Case, no Loan Party is in default under or with respect to any Contractual Obligation which could reasonably be expected to have a Material Adverse Effect.  To Borrower's knowledge, no Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.  As of the Closing Date, to Borrower's knowledge, there is no default under any Material Contract.

**5.08     Ownership of Property; Liens**.  Each Loan Party has good record and indefeasible title in fee simple to, or valid leasehold interests in, all its real and personal property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and the property of the Borrower and its Subsidiaries is subject to no Liens, other than Permitted Liens.  As used in this *Section 5.08*, a facility will be considered "material" if it has located thereon any building or mobile (manufactured) home individually valued at more than $5,000.

**5.09     Environmental Compliance**.  There are no claims alleging potential liability under or responsibility for violation of any Environmental Law except any such claims that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  There is no environmental condition or circumstance, such as the presence or Release of any Hazardous Substance, on any property owned, operated or used by any Loan Party that could reasonably be expected to have a Material Adverse Effect.  There is no violation of or by any Loan Party of any Environmental Law, except for such violations as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**5.10     Insurance**.  The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies, none of which are Haddington Entities and none of which are Affiliates of Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates.

**5.11     Taxes**.  The Borrower and its Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed, and have paid all federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) those which are being contested in good faith by

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP and (b) to the extent nonpayment would not have a Material Adverse Effect. There is no proposed tax assessment against Borrower or any of its Subsidiaries that would, if made, have a Material Adverse Effect.

**5.12     ERISA Compliance**.  The representations and warranties set forth in this *Section 5.12* shall apply only if Borrower or an ERISA Affiliate establishes a Plan.

(a)        Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws.  Each Plan that is intended to qualify under *Section 401(a)* of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto, or is based on a prototype plan document that is the subject of an opinion of the IRS, and, to the knowledge of the Borrower, nothing has occurred which would cause the inapplicability to such Plan of any such favorable determination letter or opinion or prevent the IRS from granting any pending application for a favorable determination letter with respect to any such Plan. The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to *Section 412* of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to *Section 412* of the Code has been made with respect to any Plan.

(b)        There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)        (i)        No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under *Section 4007* of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under *Section 4219* of ERISA, would result in such liability) under *Section 4201* or *4243* of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to *Section 4069* or *4212(c)* of ERISA.

**5.13     Subsidiaries and other Investments**.  Except as set forth on *Schedule 5.13*, as of the Closing Date, the Borrower will have no Subsidiaries and will have no equity Investment in any other Person.  From and after the Closing Date, the Borrower may acquire or form an entity for the purpose of making an Investment as permitted under *Section 7.02* or form an entity for the purpose of consummating a Disposition permitted under *Section 7.07*.  Any acquired or formed entity shall be reflected on an updated *Schedule 5.13* which will be delivered by Borrower to the Administrative Agent within 10 days after the acquisition or formation of such entity.  Upon delivery of such updated *Schedule 5.13* it will be automatically substituted for the prior *Schedule 5.13*.

**5.14     Margin Regulations; Investment Company Act; Use of Proceeds**.

(a)        The Borrower is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying margin stock.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

(b)      None of the Borrower, any Person controlling the Borrower or any Subsidiary is or is required to be registered as an "*investment company*" under the Investment Company Act of 1940.

(c)      The Borrower will use all proceeds of Credit Extension in the manner set forth in ***Section 6.12***.

**5.15      Disclosure**.  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Default.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided that*, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16      Compliance with Laws**.  Each Loan Party is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.17      Third Party Approvals**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any party that is not a party to this Agreement is necessary or required in connection with the execution, delivery or performance by any Loan Party of this Agreement or any other Loan Document except such approvals, consents, exemptions, authorizations or action or notice to or filings with any party the failure of which to obtain, either individually or in the aggregate, could not be reasonably expected to cause a Material Adverse Effect.

**5.18      [Reserved]**.

**5.19      Maintenance of Property**.  The Borrower and its Subsidiaries have kept all property material to the conduct of its business in good working order and condition (ordinary wear and tear excepted) for an idled plant.

**5.20      Intellectual Property**.  Each Loan Party possesses, or will obtain in the ordinary course of business, all licenses or otherwise has valid rights to use all patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property without violation of the rights of any other Person) which are necessary to carry out its business as presently conducted and as presently proposed to be conducted hereafter, except to the extent the failure to possess such licenses or rights could not reasonably be expected to cause a Material Adverse Effect, and no Loan Party is in violation in any material respect of the terms under which it possesses such intellectual property or the right to use such intellectual property.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**5.21   Anti-Terrorism**.

Neither the borrowing of the Loans by the Borrower, nor any other Related Transaction, nor the use of the respective proceeds thereof, shall cause the Lenders or the Administrative Agent to violate the U.S. Bank Secrecy Act, as amended, and any applicable regulations thereunder or any of the sanctions programs administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") of the United States Department of Treasury, any regulations promulgated thereunder by OFAC or under any affiliated or successor governmental or quasi-governmental office, bureau or agency and any enabling legislation or executive order relating thereto.  Without limiting the foregoing, no Loan Party (i) is a person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or be otherwise associated with any such person in any manner violative of Section 2 of such executive order, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.  The Loan Parties are in compliance, in all material respects, with the *Strengthening of America by Providing the Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001*.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended

**5.22   Reorganization Matters**.The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing for the approval of the Interim Order, and (z) the hearing for the approval of the Final Order will be given.  The Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(a)   After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to Permitted Liens and the Carve-Out.

(b)   After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral, subject, as to priority only, to Permitted Liens, the Carve-Out, and the Non-Primed Liens.

(c)   The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Administrative Agent's and Lenders' consent.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Commitment hereunder, or any Revolving Loan or other Obligation shall remain unpaid or unsatisfied, Borrower shall, and shall cause each of its Subsidiaries to:

**6.01    Financial Statements**.  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders (and the Administrative Agent shall deliver to the Lenders):

(a)    as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower (beginning with the first fiscal year that ends after the Closing Date), consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related statements of income and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year of the Borrower, if any, all in reasonable detail, audited and accompanied by a report and opinion of a firm of independent certified public accountants reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with GAAP (except as otherwise noted herein);

(b)    as soon as available, but in any event within 60 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, an unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related statements of income and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year of the Borrower and the corresponding portion of the previous fiscal year of the Borrower and the corresponding figures from the Business Plan and the most recent Budget delivered pursuant to Section 6.01, if any, all in reasonable detail and certified by a Responsible Officer of the Borrower, as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP (except as otherwise noted therein), subject only to normal year-end audit adjustments and the absence of footnotes;

(c)    as soon as available, but in any event within 30 days after the end of each of month (including the last month of the fiscal year of the Borrower) if requested by the Administrative Agent, an unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month, and the related statements of income and cash flows for such month and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding month of the previous fiscal year of the Borrower and the corresponding portion of the previous fiscal year of the Borrower and the corresponding figures from the Business Plan and the most recent Budget delivered pursuant to Section 6.02(e), if any, all in reasonable detail and certified by a Responsible Officer of the Borrower, as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP (except as otherwise noted therein), subject only to normal year-end audit adjustments and the absence of footnotes; and

(d)    if requested by the Administrative Agent, on a weekly basis, a summary of cash flow detailing receipts and disbursements.

**6.02    Certificates; Other Information**.  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent and the Required Lenders:

Error! Unknown document property name.

(a)     concurrently with the delivery of the financial statements referred to in **Sections 6.01(a)**, **(b)** and **(c)**, any and all pleadings, motions, applications, judicial information, financial information and other documents filed or distributed by or one behalf of the Loan Parties or their Subsidiaries, with the Bankruptcy Court or the United States Trustee in the Chapter 11 Case or any official committee appointed in any Chapter 11 Case;

(b)     [Reserved];

(c)     promptly after execution thereof, copies of each Material Contract and any material amendment thereto;

(d)     promptly, such additional information regarding the business, financial or corporate affairs of any Loan Party as the Administrative Agent, at the request of any Lender, may from time to time reasonably request; and

(e)     [as soon as available, and in any event, no later than seven (7) days following the last day of each month, the Borrower will deliver an updated "rolling" Budget for the succeeding 13-week period. Within four (4) days following the end of each week, the Borrower shall deliver a line-by-line variance report for the preceding week and on a cumulative basis from the Petition Date to the report date comparing actual cash receipts and disbursements to amounts projected in the Budget.][2]

**6.03    Notices**. Promptly notify the Administrative Agent:

(a)     of the occurrence of any Default or Event of Default, as soon as possible but in any event within ten (10) days after Borrower has knowledge thereof;

(b)     of (i) any litigation, investigation or proceeding known to and affecting any Loan Party, including any instigated by a Governmental Authority, (ii) any suspension of licenses or permits between any Loan Party and any Governmental Authority, and (iii) any dispute, litigation, investigation or proceeding involving any Loan Party related to any alleged violation of Environmental Laws, in any of the foregoing instances where (A) the amount involved exceeds (individually or collectively) $1,000,000 not covered by insurance, or (B) injunctive relief or other relief is sought; and;

(c)     of any material change in accounting policies or financial reporting practices by the Borrower or of any event, happening or circumstance that could reasonably be expected to have a Material Adverse Effect on Borrower's financial condition, other than the Chapter 11 Case;

(d)     written notice at least ten (10) days before any proposed (A) relocation of any Loan Party's principal place of business or chief executive office, (B) change of any Loan Party's name, identity, or corporate, partnership or limited liability company structure, (C) relocation of the place where the books and records concerning a Loan Party's accounts are kept, (D) relocation of any Loan Party's Collateral (other than delivery of inventory in the ordinary course of business to third party contractors for processing and sales of inventory in the ordinary course of business or as permitted by any Loan Document), and (E) change of any Loan Party's jurisdiction of organization or organizational identification number, as applicable.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action

---

[2] NTD: To be updated as needed in accordance with final agreement on Budget among the parties hereto.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

the affected Loan Party has taken and proposes to take with respect thereto.  Each notice pursuant to *Section 6.03(a)* shall describe with particularity any and all provisions of this Agreement or other Loan Document that have been breached.

   **6.04**  **Payment of Obligations**.  Pay and discharge as the same shall become due and payable (a) the Obligations, (b) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, and (c) all lawful claims which, if unpaid, would by Law become a Lien upon its property; *except,* in the case of clause (b) or (c), where (y) the validity thereof are being contested in good faith by appropriate proceedings and (z) adequate reserves in accordance with GAAP are being maintained by the appropriate Loan Party.

   **6.05**  **Preservation of Existence, Etc.**  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization, except in a transaction permitted by *Sections 7.06* and *7.07*, and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises material to the conduct of its business, except in a transaction permitted by *Sections 7.06* and *7.07, or except* where the failure to do so in each case could not reasonably be expected to have a Material Adverse Effect.

   **6.06**  **Maintenance of Assets and Business**.  (a)  Keep all property material to the conduct of its business in good working order and condition (ordinary wear and tear excepted) and make all necessary repairs thereto and replacements thereof; (b) do all things necessary to obtain, renew, extend, and continue in effect all Authorizations which may at any time and from time to time be necessary for the operation of its business in compliance with applicable Law, except where the failure to so maintain, renew, extend, or continue in effect could not reasonably be expected to have a Material Adverse Effect; (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect; and (d) use the standard of care typical in the industry in the operation and maintenance of its properties and assets.

   **6.07**  **Maintenance of Insurance**.  (a)  Maintain with responsible insurance companies insurance with respect to its properties and business (including business interruption insurance to the extent the Administrative Agent determines the same to be necessary) against such casualties and contingencies and of such types and in such amounts as is customary in the case of similar businesses and will (i) furnish to the Administrative Agent on each anniversary of the Closing Date a certificate or certificates of insurance from the applicable insurance company evidencing the existence of insurance required to be maintained by this Agreement and the other Loan Documents and evidencing that Administrative Agent is listed as mortgagee on property insurance and the Administrative Agent and Lenders are additional insureds on liability insurance, and (ii) upon request of the Administrative Agent, furnish to each Lender at reasonable intervals a certificate of an Responsible Officer of the Borrower setting forth the nature and extent of all insurance maintained in accordance with this Section.

   (b)  After the occurrence and during the continuance of an Event of Default, Borrower will, and will cause each of its Subsidiaries to, forthwith upon receipt, transmit and deliver to the Administrative Agent, in the form received, all cash, checks, drafts, chattel paper and other instruments or writings for the payment of money (properly endorsed, where required, so that such items may be collected by the Administrative Agent) which may be received by the Borrower at any time in full or partial payment of amounts due under any insurance policy in an amount in excess of $1,000,000.  After the occurrence and during the continuance of an Event of Default, any such items which may be received by the Borrower in excess of $1,000,000 will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Administrative Agent until delivery is made to the Administrative Agent.  If no Event of Default has occurred and is continuing, Administrative Agent will promptly remit to Borrower any amounts received

33

**Error! Unknown document property name.**

under any insurance policy.  If an Event of Default has occurred and is continuing, Administrative Agent shall, after consultation with Borrower, either remit to Borrower any amounts received under any insurance policy or apply such amounts as a prepayment of the Revolving Loans.

**6.08    Compliance with Laws and Contractual Obligations**.  (a)  Comply in all material respects with the requirements of all Laws (including Environmental Laws) applicable to it or to its business or property, except in such instances in which (i) such requirement of Law is being contested in good faith or a bona fide dispute exists with respect thereto or (ii) the failure to comply therewith could not be reasonably expected to have a Material Adverse Effect; and (b) comply with all material Contractual Obligations and notify Administrative Agent in writing within 10 days of having knowledge of any breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party.

**6.09    Books and Records**.  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied (except as otherwise noted therein) shall be made of all financial transactions and matters involving its assets and business.

**6.10    Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided, however*, that when an Event of Default exists the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

**6.11    Compliance with ERISA**.  With respect to each Plan maintained by a Loan Party, do each of the following: (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws, (b) cause each Plan which is qualified under *Section 401(a)* of the Code to maintain such qualification; and (c) make all required contributions to any Plan subject to *Section 412* of the Code, *except* to the extent that noncompliance, with respect to each event listed above, could not be reasonably expected to have a Material Adverse Effect

**6.12    Use of Proceeds**.  Upon entry of the Interim Order, the Borrower shall borrow sufficient funds under this Agreement (which amounts shall not, for the avoidance of doubt, exceed the Aggregate Revolving Commitment (without giving effect to any fees or PIK Interest added to the Outstanding Amount of the Revolving Loans) in order to pay, and shall concurrently apply the proceeds of such borrowings on the Closing Date (and as a condition to closing under this Agreement) for costs and expenses related to working capital, (ii) pay amounts owing to the Administrative Agent and the Lenders; and (iii) prior to an Event of Default, pay fees and expenses of professionals retained by Borrower or the official committee of unsecured creditors, to the extent set forth in the Budget and subject to such carve-outs and other agreements as may be agreed to by the Administrative Agent, to the extent such professional fees and expenses are approved by [final order] (provided, however, that Borrower shall consult with the Administrative Agent as to the form of any interim compensation procedures order that they submit to the Bankruptcy Court and that, in any event, each such order shall preserve the Administrative Agent's right to review and object to any monthly, interim or final request for the payment of fees or reimbursement of expenses submitted to the Bankruptcy Court**)**.  The Borrower may incur additional Revolving Loans from and after the Closing Date to pay administrative expenses for goods and services in the ordinary course of business (other than fees and expenses of professional persons) and to the extent set forth in the Budget.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

**6.13    Material Contracts**.  Comply with its obligations under all Material Contracts, *except to the extent* non-compliance could not reasonably be expected to result in a Material Adverse Effect, and enforce the obligations of other parties to the Material Contracts and notify Administrative Agent in writing within 10 days of having knowledge of any breach or non-performance of, or any default under, any Material Contract by any party thereto.

**6.14    [Reserved] Further Assurances; Additional Collateral**.  (a) The Borrower shall cause each Subsidiary to take such actions and to execute and deliver such documents and instruments as the Administrative Agent shall require to ensure that the Administrative Agent on behalf of the Secured Parties shall, at all times, have received currently effective duly executed Loan Documents granting Liens and security interests in substantially all of the assets of the Borrower and each Subsidiary, including all capital stock, partnership, joint venture, membership interests, or other equity interests *except for* (i) any motor vehicle or other equipment that has a certificate of title, (ii) Excluded Assets and (iii) those properties and assets as to which the Administrative Agent shall determine in its sole discretion (in consultation with the Borrower) that the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby.

(b)    In connection with the actions required pursuant to the foregoing subsection (a), the Borrower shall cause each Subsidiary to execute and deliver such stock certificates, blank stock powers, evidence of corporate authorization, opinions of counsel, current valuations, evidence of title, and other documents, and shall use commercially reasonable efforts to obtain third party consents, as shall be reasonably requested by the Administrative Agent, in each case in form and substance reasonably satisfactory to the Administrative Agent.

(c)    The Liens required by this *Section 6.15* shall be in favor of the Administrative Agent for the benefit of the Secured Parties, subject to no other Liens except Permitted Liens.  The Liens required by this *Section 6.15* shall be perfected Liens in favor of the Administrative Agent for the benefit of the Secured Parties in all Collateral.

**6.16    Budget Compliance.**

.  The proceeds of the Revolving Loans made under this Agreement shall be used by the Borrower solely for the purposes and up to the amounts set forth in the Budget and in accordance with the Interim Order and the Final Order.

**6.17    Fiscal Year**.  The Borrower shall maintain its December 31 fiscal year end.

**6.18    Post-Closing Obligations**.  The Borrower shall have paid Attorney Costs of the Administrative Agent to the extent invoiced prior to, or on, May [___], 2016, for legal services rendered to the Administrative Agent in connection with the preparation, negotiation, execution and delivery of this Agreement on and prior to May [___], 2016 in connection with this Agreement and the other Loan Documents.

**6.19    [Reserved]**.

**ARTICLE VII.**
**NEGATIVE COVENANTS**

So long as any Lender shall have any Revolving Commitment hereunder, or any Revolving Loan or other Obligations shall remain unpaid or unsatisfied, Borrower agrees that it shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**7.01    Liens**.  Create, incur, assume or suffer to exist, any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following ("*Permitted Liens*"); *provided*, that the provisions of this Section 7.01 shall not prevent the creation, incurrence, filing, assumption or existence of the following subject to the priorities provided in the Interim Order or Final Order, as applicable:

(a)    Liens placed after the Petition Date and in accordance with the Bankruptcy Code upon assets used in the ordinary course of business of the Borrower or any of its Subsidiaries at the time of acquisition thereof by the Borrower or any such Subsidiary or within ninety (90) days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof, provided that, in all events, the Lien encumbering the assets so acquired does not encumber any other asset of Holdings or such Subsidiary;

(b)    [Liens in favor of customs and revenue authorities arising, after the Petition Date as a matter of law or regulation and in accordance with the Bankruptcy Code to secure the payment of customs duties in connection with the importation of goods and deposits made to secure statutory obligations in the form of excise taxes];

(c)    Liens pursuant to any Loan Document;

(d)    Liens existing on the Closing Date and listed on *Schedule 7.01* to this Agreement, and any renewals or extensions thereof; *provided* that the property covered thereby is not increased and the amount of the Indebtedness secured thereby is not increased;

(e)    Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(f)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(g)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(h)    deposits to secure the performance of bids, trade contracts and leases (other than for Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(i)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which are in existence on the Closing Date or which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(j)    judgment Liens not giving rise to an Event of Default;

(k)    purchase money Liens upon or in any property acquired, constructed or improved by Borrower or any Subsidiary (placed on such property at the time of such acquisition or the completion of the construction or improvement or within 90 days thereafter) to secure the deferred portion of the

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

purchase price of such property or to secure Indebtedness incurred to finance the acquisition, construction or improvement of such property; *provided that* (i) no such Lien shall be extended to cover property other than the property being acquired, constructed or improved and (ii) the Indebtedness thereby secured is permitted by *Section 7.04(e)*;

(l)     Liens of licensors of patents, trademarks and other intellectual property rights granted to the Borrower or any of its Subsidiaries and Liens of licenses and sublicenses granted by the Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of the Borrower and its Subsidiaries; and

(m)     any Lien existing on any asset (other than stock (or equivalent equity interest) of a Subsidiary) prior to acquisition thereof by Borrower or any Subsidiary; *provided that* (i) no such Lien shall be extended to cover property other than the asset being acquired, and (ii) such Lien was not created in contemplation of or in connection with such acquisition.

[The prohibition provided for in this Section 7.01 specifically includes, without limitation, any effort by any Loan Party or any other party-in-interest in the Chapter 11 Case to prime or create *pari passu* to any claims, Liens or interests of the Administrative and the Lenders any Lien (other than for the Carve-Out and the Non-Primed Liens) irrespective of whether such claims, Liens or interests may be "adequately protected".]

**7.02    Investments**.  Make or own any Investments, except:

(a)     Investments existing on the Closing Date and listed in Section (B) of *Schedule 5.13*;

(b)     Cash Equivalents in a manner consistent with the Budget;

(c)     Investments constituting Indebtedness permitted under *Section 7.04(c)* and otherwise consistent with the Budget;

(d)     [Reserved];

(e)     [Reserved];

(f)     Guarantees of Indebtedness permitted under *Section 7.04*;

(g)     endorsements for collection or deposit in the ordinary course of business and in a manner consistent with the Budget; and

(h)     Investments not otherwise permitted by this *Section 7.02* in an aggregate amount not to exceed the amount, if any, set forth in the Budget at any time outstanding.

**7.03    [Reserved]**.

**7.04    Indebtedness**.  Create, incur, or assume any Indebtedness except:

(a)     Indebtedness incurred pursuant to the Loan Documents;

(b)     Indebtedness existing on the Closing Date and listed on *Schedule 7.04* and renewals, extensions and replacements of such Indebtedness which do not increase the outstanding principal amount thereof;

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(c)      Indebtedness (A) owed by Borrower to a Loan Party and (B) owed by a Loan Party to Borrower or another Loan Party, in each case, on the Closing Date;

(d)      [Reserved];

(e)      Indebtedness of the Borrower or any Subsidiary in respect of purchase money obligations for fixed or capital assets within the limitations set forth in **Section 7.01(i)**; *provided, however,* that the aggregate amount of such Indebtedness at any one time outstanding shall not exceed the amounts set forth in **Section 7.10**; *provided further,* that such dollar amount shall not include Indebtedness incurred with respect to fixed or capital assets which constitute replacements of existing equipment;  and

(f)      Indebtedness of the Borrower or any Subsidiary in respect of Capital Lease obligations; *provided that,* such Capital Lease obligations will not require the payment of an aggregate amount in excess of $1,000,000 annually; *provided further,* that such dollar amount shall not include Capital Lease obligations incurred with respect to Capital Leases which cover assets that are replacements of existing equipment.

**7.05    Lease Obligations**.  Create or suffer to exist any obligations for the payment of rent for any property under operating leases or agreements to lease, except for operating leases or agreements to lease having an annual aggregate payment amount not to exceed $2,000,000, exclusive of expenses for maintenance, repairs, insurance, taxes, assessments and similar changes; *provided* that such dollar amount shall not include operating leases or agreements to lease which cover assets that are replacements of existing equipment.

**7.06    Fundamental Changes**.

(a)      Merge or consolidate with or into, or convey, transfer, lease or otherwise Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; *except that,* so long as no Default exists or would result therefrom:

(i)      any Person may merge, dissolve or liquidate into Borrower; *provided* that Borrower is the surviving entity;

(ii)      any Loan Party may merge, dissolve or liquidate with (i) Borrower; *provided* that Borrower shall be the continuing or surviving Person, (ii) any Person; *provided* that the Loan Party shall be the continuing or surviving Person, or (iii) any one or more Loan Parties; *provided* that when any Wholly-Owned Subsidiary is merging with another Subsidiary, a Wholly-Owned Subsidiary shall be the continuing or surviving Person;

(iii)      any Subsidiary may sell all or substantially all of its assets (upon voluntary liquidation or otherwise), to Borrower or to another Subsidiary; *provided* that if the seller in such a transaction is a Wholly-Owned Subsidiary, then the purchaser must also be a Wholly-Owned Subsidiary; and

(iv)      any Person (other than Borrower or a Subsidiary of Borrower) may merge, dissolve or liquidate into any Subsidiary; *provided* that such Subsidiary is the surviving entity.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**7.07     Dispositions**.   Make any Disposition or enter into any agreement to make any Disposition, except:

(a)     Dispositions by the Borrower or any Subsidiary of inventory in the ordinary course of business;

(b)     Dispositions of property by any Subsidiary to Borrower, or by any Subsidiary or by Borrower to a Wholly-Owned Subsidiary that is a Guarantor;

(c)     Dispositions of property that is no longer commercially viable to maintain or is obsolete, surplus or worn-out property;

(d)     Dispositions permitted under *Section 7.06*;

(e)     Dispositions of property that is being replaced; or

(f)     other Dispositions aggregating not more than $600,000 during any consecutive twelve month period.

**7.08     Restricted Payments; Distributions and Redemptions**.   Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, without the written consent of the Administrative Agent in its sole discretion, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(a)     a Subsidiary may make Restricted Payments to Borrower and to Wholly-Owned Subsidiaries of Borrower;

(b)     for so long as the Borrower is a "disregarded entity" or "pass through entity" under the Code, the Borrower may declare and pay distributions to all members owning membership interest in the Borrower in an amount not to exceed, for any fiscal year of the Borrower, the amount necessary for the ultimate owners of such members to pay their state and federal income taxes on the basis of Borrower's net income, which taxes shall be calculated at the highest marginal tax rate applicable to the ultimate member owning a membership interest in Borrower or the Parent;

(c)     [Reserved];

(d)     [Reserved]; and

(e)     [Reserved].

**7.09     ERISA**.   At any time engage in a transaction which could be subject to *Section 4069* or *4212(c)* of ERISA, or knowingly permit any Plan maintained by a Loan Party to: (a) engage in any non-exempt "*prohibited transaction*" (as defined in *Section 4975* of the Code); (b) fail to comply with ERISA or any other applicable Laws; or (c) incur any material "*accumulated funding deficiency*" (as defined in *Section 302* of ERISA), which, with respect to each event listed above, could be reasonably expected to have a Material Adverse Effect.

**7.10     Nature of Business; Capital Expenditures**.   Engage in any line of business other than the Midstream Business, or make any Capital Expenditures permitted by *Section 7.02*; *further provided,* that annual Capital Expenditures shall not exceed the amounts for the periods specified below:

39

Tristream East Texas, LLC
DIP Credit Agreement

| Fiscal Year | Capital Expenditures (including Maintenance CapEx) |
|---|---|
| 2016 | $2,000,000 |
| 2017 | $2,000,000 |

**7.11    Transactions with Affiliates.**   Enter into any transaction of any kind with any Haddington Entity or any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate.

**7.12    Burdensome Agreements.**   Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Borrower or to otherwise transfer property to the Borrower, (ii) of any Subsidiary to guarantee the Indebtedness of the Borrower or (iii) of the Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; *provided*, *however*, that this clause (iii) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under *Sections 7.04(e)* and *(f)* solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.13    Use of Proceeds.**   Use the proceeds of any Revolving Loan for purposes other than those permitted by *Section 6.12*, or use the proceeds of any Revolving Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose.

**7.14    Organization Documents; Material Contracts.**   Permit any amendment to the Organization Document of any Loan Party, if such amendment could reasonably be expected to (y) have a Material Adverse Effect on the ability of any Loan Party to perform its obligations under the Loan Documents to which it is a party or (z) otherwise materially adversely affect the Lenders . No Loan Party shall assume, reject, cancel, terminate, breach or modify (a) any Material Contract or (b) any other agreement, contract, instrument or document if the assumption, rejection, cancellation, termination, breach or modification of such agreement, contract, instrument or document, either individually or in the aggregate, would have a negative effect on the value of the Collateral or a Material Adverse Effect, except with the consent of the Administrative Agent.

**7.15    Change of Control.**   Permit any Change of Control to occur or take any corporate, partnership or limited liability company action to authorize or effect any Change of Control.

**7.16    OFAC.**   No Loan Party (i) will become a person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) will engage in any dealings or transactions prohibited by Section 2 of such executive order, or be otherwise associated with any such person in any manner violative of Section 2, or (iii) will otherwise become a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

Tristream East Texas, LLC
DIP Credit Agreement

     **7.17**    **Bankruptcy Claims**. No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of the Administrative Agent Lenders against Borrower, except as set forth in the Interim Order or Final Order, as applicable.

**ARTICLE VIII.**
**EVENTS OF DEFAULT AND REMEDIES**

     **8.01**    **Events of Default**. Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, the occurrence of any one or more of the following events (regardless of the reason therefore) shall constitute an Event of Default if such default has not been cured within ten (10) days of the Borrower either obtaining actual knowledge or receiving written notice of such default ("***Event of Default***"):

     (a)    <u>Non-Payment</u>. The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Revolving Loan or (ii) within 5 days after the same becomes due any interest on any Revolving Loan any Revolving Commitment or other fee due hereunder or under the Fee Letter, or any other amount payable hereunder or under any other Loan Document; or

     (b)    <u>Specific Covenants</u>. The Borrower fail to perform or observe any term, covenant or agreement contained in the Fee Letter or any of ***Sections 6.01, 6.02, 6.03, 6.05, 6.07, 6.08, 6.10, 6.12*** or ***6.14***, or ***Article VII*** herein; or

     (c)    <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

     (d)    <u>Representations and Warranties</u>. Any representation or warranty made or deemed made by the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith proves to have been materially incorrect when made or deemed made; or

     (e)    <u>Cross-Default</u>. Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Post-Petition Indebtedness or Post-Petition Guaranty (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $1,000,000, or (B) fails to observe or perform any other agreement or condition relating to any such Post-Petition Indebtedness or Post-Petition Guaranty or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Post-Petition Indebtedness or the beneficiary or beneficiaries of such Post-Petition Guaranty (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, the entire amount of such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem the entire amount of such Post-Petition Indebtedness to be made, prior to its stated maturity, or such Post-Petition Guaranty to become payable or cash collateral in respect thereof to be demanded; or

     (f)    [Reserved]; or

41

**Error! Unknown document property name.**

(g)      [Reserved]; or

(h)      Judgments.  There is entered against any Loan Party (i) a final non-appealable judgment or order for the payment of money in an aggregate amount exceeding (individually or collectively) $1,000,000 (to the extent not covered by third-party insurance), or (ii) any non-monetary final non-appealable judgment that has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order; or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)      ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under *Section 4201* of ERISA under a Multiemployer Plan in an aggregate amount in excess of $1,000,000; or

(j)      Invalidity of Loan Documents.  Any Loan Document, at any time after its execution and delivery and for any reason other than the agreement of all the Lenders or termination of all Revolving Commitments and satisfaction in full of all the Obligations, ceases to be in full force and effect, or is declared by a court of competent jurisdiction to be null and void, invalid or unenforceable in any material respect; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)      Change of Control.  There occurs any Change of Control; or

(l)      Dissolution.  A Loan Party shall dissolve, liquidate, or otherwise terminate its existence, except as permitted in *Section 7.06*; or

(m)      Material Contracts.  (i) Termination of any Material Contract, or any material provision thereof if such termination could reasonably be expected to have a Material Adverse Effect and such agreement or provision is not replaced (prior to such termination) in a manner reasonably satisfactory to the Administrative Agent; or (ii) default by any Person in the performance or observance of any material term of any Material Contract which is not cured within the applicable cure period specified in such Material Contract, if such default could reasonably be expected to have a Material Adverse Effect; or

(n)      Collateral; Impairment of Security, etc.  Any provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against a Loan Party or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder;

(o)      Chapter 11 Cases.

The occurrence of any of the following in any Chapter 11 Case:

(i)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, in each case, by the Borrower in any Chapter 11 Case, or the entry of any order by the Bankruptcy Court in any Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (x) to grant any Lien (other than any Lien permitted hereunder) upon or affecting any Collateral; (y) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Requisite Lenders; or

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(z) that (in the case of the Borrower) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by the Borrower) approves or provides authority to take any other action or actions adverse to the Administrative Agent and the Lenders or their rights and remedies hereunder or their interest in the Collateral;

(ii)     the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Borrower to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iii)     the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Aggregate Revolving Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of the Administrative Agent;

(v)     the Final Order is not entered within thirty (30) days (or such other period as the Administrative Agent and Required Lenders may agree to in writing) following the entry of the Interim Order;

(vi)     the payment of, or application by the Borrower for authority to pay, any Pre-Petition claim without the Administrative Agent's and Required Lenders' prior written consent other than as provided in any First Day Order in form and substance acceptable to Agent and as set forth in the Budget or unless otherwise permitted under this Agreement;

(vii)     the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) the Administrative Agent or Lenders or against agent or lenders under the Pre-Petition Credit Agreement; or the sale without the Administrative Agent's and Lenders' consent, of all or substantially all of the Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Aggregate Revolving Commitments;

(viii)     the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(ix)     the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(x)     the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xi)     the failure of the Borrower to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order;

(xii)     the challenge by the Borrower to the validity, extent, perfection or priority of any liens granted under the Pre-Petition Credit Agreement;

(xiii)     the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures and agreements acceptable to the Administrative Agent;

(xiv)     the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien [(other than the Carve-Out)] equal or superior to that granted to the Administrative Agent, on behalf of itself and Lenders without the consent in writing of the Administrative Agent and Required Lenders; or

(xv)     consolidating or combining the Borrower with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of Lenders.

**8.02     Remedies Upon Event of Default**.  (a)  <u>Termination of Commitments</u>.  Upon the occurrence of any Default or Event of Default, the Administrative Agent may, and at the request of Required Lenders, the Administrative Agent shall, notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to and in accordance with the terms of the Interim Order or Final Order, as applicable, without any application, motion or notice to, hearing before, or order from, either Bankruptcy Court, without notice or demand, immediately suspend or terminate all or any portion of Lenders' obligations to make additional Revolving Loans under the Aggregate Revolving Commitments; *provided* that, in the case of a Default, if the subject condition or event is waived by Required Lenders or cured within any applicable grace or cure period, the Aggregate Revolving Commitment shall be reinstated.

(b)     <u>Acceleration and other Remedies</u>.   If any Event of Default has occurred and is continuing, Administrative Agent may (and at the request of the Required Lenders shall), notwithstanding the provision of section 362 of the Bankruptcy Code subject to and in accordance with the terms of the Interim Order or the Final Order, as applicable, (i) terminate the Aggregate Revolving Commitments with respect to making additional Revolving Loans; (ii) reduce the Aggregate Revolving Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of any Loan to be due and payable in accordance with the terms of the Interim Order or the Final Order: or (iv) exercise any rights and remedies provided to the Administrative Agent under the Loan Documents, the Interim Order, the Final Order or at law or equity.

**8.03     Application of Funds**.  After the exercise of remedies provided for in *Section 8.02* (or after the Revolving Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent as set forth in *Section 2.10(d)*.

**8.04     Performance by Administrative Agent**.  If the Borrower or any Loan Party shall fail to perform any covenant, duty or agreement contained in any of the Loan Documents, the Administrative Agent may perform or attempt to perform such covenant, duty or agreement on behalf of the Borrower or

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

such Loan Party after the expiration of any cure or grace periods set forth herein. In such event, the Borrower or such Loan Party shall, at the request of the Administrative Agent, promptly pay any amount reasonably expended by the Administrative Agent in such performance or attempted performance to the Administrative Agent, together with interest thereon at the highest rate of interest in effect upon the occurrence of an Event of Default as specified herein from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly agreed that the Administrative Agent shall not have any liability or responsibility for the performance of any obligation of the Borrower and any Loan Party under this Agreement or any other Loan Document.

## ARTICLE IX.
## ADMINISTRATIVE AGENT

**9.01    Appointment and Authorization of Agents**.  (a)   Each Lender hereby irrevocably (subject to *Section 9.10*) appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall not  have any duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "*agent*" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)      [Reserved].

(c)      [Reserved].

**9.02    Delegation of Duties**.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct.

**9.03    Default; Collateral**. (a) Upon the occurrence and continuance of a Default, the Lenders agree to promptly confer in order that Required Lenders or the Lenders, as the case may be, may agree upon a course of action for the enforcement of the Rights of the Lenders; and the Administrative Agent shall be entitled to refrain from taking any action (without incurring any liability to any Person for so refraining) *unless and until* the Administrative Agent shall have received instructions from Required Lenders.  All rights of action under the Loan Documents and all right to the Collateral, if any, hereunder may be enforced by the Administrative Agent and any suit or proceeding instituted by the Administrative Agent in furtherance of such enforcement shall be brought in its name as the Administrative Agent without the necessity of joining as plaintiffs or defendants any other Lender, and the recovery of any judgment shall be for the benefit of the Lenders, subject to the reasonable expenses of the Administrative Agent.   In actions with respect to any property of the Borrower or any other Loan Party, the Administrative Agent  is acting for the ratable benefit of each Lender.  Any and all agreements to

45

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

subordinate (whether made heretofore or hereafter) other Indebtedness or obligations of the Borrower to the Obligations shall be construed as being for the ratable benefit of each Lender.

(b)　　[Reserved].

(c)　　*Except* to the extent unanimity (or other percentage set forth in ***Section 10.01***) is required hereunder, each Lender agrees that any action taken by the Required Lenders in accordance with the provisions of the Loan Documents, and the exercise by the Required Lenders of the power set forth herein or therein, *together with* such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.

(d)　　The Administrative Agent is hereby authorized on behalf of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time to take any action with respect to any Collateral which may be necessary to perfect and maintain perfected the Liens existing in favor of the Administrative Agent upon the Collateral.

(e)　　The Administrative Agent shall have no obligation whatsoever to any Lender or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected, or insured or has been encumbered or that the Liens granted to the Administrative Agent herein or pursuant thereto have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the Rights granted or available to the Administrative Agent in this ***Section 9.03***; it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral as one of the Lenders and that the Administrative Agent shall have no duty or liability whatsoever to any Lender, other than to act without gross negligence or willful misconduct.

(f)　　The Lenders hereby irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral: (i) constituting property in which no Loan Party owned an interest at the time the Lien was granted or at any time thereafter; (ii) constituting property leased or granted to an Loan Party under a lease, easement or right-of-way which has expired or been terminated in a transaction permitted under the Loan Document or is about to expire and which has not been, and is not intended by such Loan Party to be, renewed; and (iii) consisting of an instrument evidencing Indebtedness pledged to the Administrative Agent (for the benefit of the Lenders), if the Indebtedness evidenced thereby has been paid in full.  In addition, the Lenders irrevocably authorize the Administrative Agent to release Liens upon Collateral as contemplated in ***Section 10.01(c)*** or ***(d)***, or if approved, authorized, or ratified in writing by the requisite Lenders.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this ***Section 9.03***.

(g)　　In furtherance of the authorizations set forth in this ***Section 9.03***, each Lender hereby irrevocably appoints the Administrative Agent its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such Lender (i)　to take action with respect to the Collateral to perfect, maintain, and preserve Lenders' Liens, and (ii) to execute instruments of release or to take other action necessary to release Liens upon any Collateral to the extent authorized in subsection (f) hereof. This power of attorney shall be liberally, not restrictively, construed so as to give the greatest latitude to the Administrative Agent's power, as attorney, relative to the Collateral matters described in this ***Section 9.03***.  The powers and authorities herein conferred on the Administrative Agent may be exercised by the Administrative Agent through any Person who, at the time of the execution of a particular instrument, is

46

Tristream East Texas, LLC
DIP Credit Agreement

an officer of the Administrative Agent (or any Person acting on behalf of the Administrative Agent pursuant to a valid power of attorney).  The power of attorney conferred by this *Section 9.03(g)* to the Administrative Agent is granted for valuable consideration and is coupled with an interest and is irrevocable so long as the Obligations, or any part thereof, shall remain unpaid or the Lenders have any Revolving Commitment hereunder.

      **9.04**    **Liability of Agents**.  No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, or to make any inquiry respecting the performance by Borrower of its obligations hereunder or under any other Loan Document, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Haddington Entity, Loan Party or any Affiliate thereof.

      **9.05**    **Reliance by Administrative Agent**.  (a)  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile, or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders or all the Lenders, if required hereunder, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and participants.  Where this Agreement expressly permits or prohibits an action unless the Required Lenders otherwise determine, the Administrative Agent shall, and in all other instances, the Administrative Agent may, but shall not be required to, initiate any solicitation for the consent or a vote of the Lenders.

      (b)    For purposes of determining compliance with the conditions specified in *Section 4.01*, each Lender that has funded its Pro Rata Share of the Borrowing(s) on the Closing Date (or, if there is no Borrowing made on such date, each Lender other than Lenders who gave written objection to the Administrative Agent prior to such date) shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter either sent by the Administrative Agent to such Lender for consent, approval, acceptance or satisfaction, or required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

**9.06    Notice of Default**.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "*notice of default*." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to such Default or Event of Default as may be directed by the Required Lenders in accordance with ***Article VIII***; *provided, however*, that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

**9.07    Credit Decision; Disclosure of Information by Administrative Agent**.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by the Administrative Agent hereinafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, or of any Haddington Entity, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and its Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Haddington Entity, or of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent Related Person.  In this regard, each Lender acknowledges that King & Spalding LLP is acting in this transaction as special counsel to the Administrative Agent in respect of this Agreement only.  Each other party hereto will consult with its own legal counsel to the extent it deems necessary in connection with the Loan Documents and the matters contemplated therein.

**9.08    Indemnification of Agents**.  WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, THE LENDERS SHALL INDEMNIFY UPON DEMAND EACH AGENT-RELATED PERSON (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF ANY LOAN PARTY AND WITHOUT LIMITING THE OBLIGATION OF ANY LOAN PARTY TO DO SO), PRO RATA, AND HOLD HARMLESS EACH AGENT-RELATED PERSON FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES INCURRED BY IT; PROVIDED, HOWEVER, THAT NO LENDER SHALL BE LIABLE FOR THE PAYMENT TO ANY AGENT-RELATED PERSON OF ANY PORTION OF SUCH INDEMNIFIED LIABILITIES RESULTING FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; *provided, however*, that no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of Rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower. The undertaking in this Section shall survive termination of the Revolving Commitments, the payment of all Obligations hereunder and the resignation or replacement of the Administrative Agent.

**9.09    Administrative Agent in its Individual Capacity**.  HEP IV and its Affiliates may make loans to, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with any other Haddington Entity, any of the Loan Parties and their respective Affiliates as though HEP IV were not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, HEP IV or its Affiliates may receive information regarding any other Haddington Entity, any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Haddington Entity, Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.  With respect to its Revolving Loans, HEP IV shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "*Lender*" and "*Lenders*" include HEP IV in its individual capacity.

**9.10    Successor Administrative Agent**.    The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders with a copy of such notice to the Borrower.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor administrative agent for the Lenders which successor administrative agent shall be consented to by the Borrower at all times other than during the existence of a Default (which consent of the Borrower shall not be unreasonably withheld or delayed).  If no successor administrative agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders and the Borrower, a successor administrative agent from among the Lenders.  Upon the acceptance of its appointment as successor administrative agent hereunder, such successor administrative agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "*Administrative Agent*" shall mean such successor administrative agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated.    After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this *Article IX* and *Sections 10.04* and *10.13* shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.  If no successor administrative agent has accepted appointment as Administrative Agent by the date which is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

**9.11    Other Agents**.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as any other type of agent (other than the Administrative Agent), "arranger," or "bookrunner" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such.  Without limiting the foregoing, none of the Lenders so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

**9.12    Administrative Agent May File Proofs of Claim**.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Revolving Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Revolving Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders  and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under *Sections 2.07*, *10.04* and *10.05*) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under *Sections 2.07*, *10.04* and *10.05*.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the Rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.13    [Reserved]**.

### ARTICLE X.
### MISCELLANEOUS

**10.01    Amendments, Release of Collateral, Etc.**  (a)  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however*, that no such amendment, waiver or consent shall, unless in writing and signed by each of the Lenders directly affected thereby and by the Borrower, and acknowledged by the Administrative Agent, do any of the following:

(i)    extend or increase the Revolving Commitment of any Lender (or reinstate any Revolving Commitment terminated pursuant to *Section 8.02*);

(ii)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document;

50

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(iii)    reduce the principal of, or the rate of interest specified herein on, any Revolving Loan or (subject to clause (ii) of the proviso below) any fees or other amounts payable hereunder or under any other Loan Document; *provided, however*, that only the consent of the Required Lenders shall be necessary to (A) amend the definition of "*Default Rate*" or to waive any obligation of the Borrower to pay interest at the Default Rate or (B) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Revolving Loan or to reduce any fee payable hereunder;

(iv)    change the percentage of the Aggregate Revolving Commitment or of the aggregate unpaid principal amount of the Revolving Loans which is required for the Lenders or any of them to take any action hereunder;

(v)    change the Pro Rata Share of any Lender;

(vi)    release any Collateral or release any Guarantor from a Guaranty (except in connection with a Disposition permitted under *Section 7.07* or as otherwise permitted under this *Section 10.01*); or

(vii)    amend this Section, or *Section 2.11*, or any provision herein providing for unanimous consent or other action by all the Lenders;

and, *provided further*: (i)  no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Required Lenders affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) the Fee Letter may only be amended or rights and privileges thereunder waived in a writing executed by the parties thereto.   Notwithstanding anything to the contrary herein, no Defaulting Lender shall have the right to approve or disapprove any amendment, waiver or consent hereunder, except that the Pro Rata Share of a Defaulting Lender may not be increased without the consent of such Defaulting Lender.

(b)    Any amendment to any Loan Document which purports to (i) decrease the amount of any mandatory prepayment required by *Section 2.03*, or (ii) change this *Section 10.01(b)*, must be by an instrument in writing executed by Borrower, the Administrative Agent, and the Required Lenders.

(c)    Upon any sale, transfer, or Disposition of Collateral which is permitted pursuant to the Loan Documents, and upon 5 Business Days' prior written request by the Borrower (which request must be accompanied by (i) true and correct copies of all material documents of transfer or Disposition, including any contract of sale, (ii) a preliminary closing statement and instructions to the title company, if any, (iii) all requested release instruments in form and substance satisfactory to the Administrative Agent and (iv) if required, written consent of the requisite Lenders), the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of Liens granted to the Administrative Agent for the benefit of the Secured Parties pursuant hereto in such Collateral.   The Administrative Agent shall not be required to execute any release instruments on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligation or entail any consequence other than the release of Liens without recourse or warranty.   No such release shall impair the Administrative Agent's Lien on the proceeds of sale of such Collateral.

(d)    [Reserved].

(e)    [Reserved].

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**10.02    Notices and Other Communications; Facsimile Copies**.

(a)    General.    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder and under the other Loan Documents shall be in writing (including by electronic mail and facsimile transmission) and mailed, emailed, faxed or delivered, to the address, facsimile number or (subject to subsection (c) below) electronic mail address specified for notices on *Schedule 10.02* (for the Loan Parties and the Administrative Agent) or on the Administrative Details Form (for the other Lenders); or, in the case of the Borrower, the Loan Parties, the Administrative Agent to such other address as shall be designated by such party in a notice to the other parties, and in the case of any other party, to such other address as shall be designated by such party in a notice to the Borrower and the Administrative Agent. All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the intended recipient and (ii) (A) if delivered by hand or by courier, when signed for by the intended recipient; (B) if delivered by mail, four Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of subsection (c) below), when delivered; *provided, however*, that notices and other communications to the Administrative Agent pursuant to *Article II* shall not be effective until actually received by such Person. Any notice or other communication permitted to be given, made or confirmed by telephone hereunder shall be given, made or confirmed by means of a telephone call to the intended recipient at the number specified in accordance with this Section, it being understood and agreed that a voicemail message shall in no event be effective as a notice, communication or confirmation hereunder.

(b)    Effectiveness of Facsimile Documents and Signatures.    Loan Documents may be transmitted and/or signed by facsimile and electronic mail. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually-signed originals and shall be binding on all Loan Parties, the Administrative Agent and the Lenders. The Administrative Agent may also require that any such documents and signatures be confirmed by a manually-signed original thereof; *provided, however*, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

(c)    Limited Use of Electronic Mail.    Electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and shall not be recognized hereunder for any other purpose.

(d)    Reliance by Administrative Agent and Lenders.    The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Notices) purportedly given by or on behalf of Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic notices to and other communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.03    No Waiver; Cumulative Remedies**. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein or therein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Tristream East Texas, LLC
                                                                    DIP Credit Agreement

Error! Unknown document property name.

**10.04   Attorney Costs; Expenses and Taxes**.  The Borrower agrees (a) to pay or reimburse the Administrative Agent for all reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation, negotiation, syndication, administration and execution of this Agreement and the other Loan Documents, including the filing, recording, refiling or rerecording of any mortgage, any pledge agreement and any security agreement and/or any UCC financing statements relating thereto and all amendments, supplements and modifications to any thereof and any and all other documents or instruments of further assurance required to be filed or recorded or refiled or rerecorded by the terms hereof or of any mortgage, any pledge agreement or any security agreement, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs, and (b) to pay or reimburse the Administrative Agent and each Lender for all out-of-pocket costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement or the other Loan Documents (including all such out-of-pocket costs and expenses incurred during any workout or restructuring in respect of the Obligations and during any legal proceeding, including the Chapter 11 Case), including all Attorney Costs.  The foregoing costs and expenses shall include all search, filing, recording, title insurance and appraisal charges and fees and taxes related thereto, and other out-of-pocket expenses incurred by the Administrative Agent and the cost of independent public accountants and other outside experts retained by the Administrative Agent or any Lender.  The agreements in this Section shall survive the termination of the Revolving Commitments and repayment of all the other Obligations.

**10.05   Indemnification.**  WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, EACH OF THE BORROWER AND EACH GUARANTOR, JOINTLY AND SEVERALLY, AGREES TO INDEMNIFY, SAVE AND HOLD HARMLESS EACH AGENT-RELATED PERSON, THE ADMINISTRATIVE AGENT, EACH LENDER AND THEIR RESPECTIVE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND ATTORNEYS-IN-FACT (COLLECTIVELY THE "INDEMNITEES") FROM AND AGAINST: (A) ANY AND ALL CLAIMS, DEMANDS, ACTIONS OR CAUSES OF ACTION THAT ARE ASSERTED AGAINST ANY INDEMNITEE BY ANY PERSON (OTHER THAN THE ADMINISTRATIVE AGENT OR ANY LENDER) RELATING DIRECTLY OR INDIRECTLY TO A CLAIM, DEMAND, ACTION OR CAUSE OF ACTION THAT SUCH PERSON ASSERTS OR MAY ASSERT AGAINST ANY HADDINGTON ENTITY, ANY LOAN PARTY, ANY AFFILIATE OF ANY LOAN PARTY OR ANY OF THEIR RESPECTIVE OFFICERS OR DIRECTORS, ARISING OUT OF OR RELATING TO, THE LOAN DOCUMENTS, THE REVOLVING COMMITMENTS, THE USE OR CONTEMPLATED USE OF THE PROCEEDS OF ANY REVOLVING LOANS, OR THE RELATIONSHIP OF ANY LOAN PARTY, THE ADMINISTRATIVE AGENT AND THE LENDERS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT; (B) ANY AND ALL CLAIMS, DEMANDS, ACTIONS OR CAUSES OF ACTION THAT MAY AT ANY TIME (INCLUDING AT ANY TIME FOLLOWING REPAYMENT OF THE OBLIGATIONS AND THE RESIGNATION OF THE ADMINISTRATIVE AGENT OR THE REPLACEMENT OF ANY LENDER) BE ASSERTED OR IMPOSED AGAINST ANY INDEMNITEE BY ANY PERSON (INCLUDING BY THE BORROWER OR ANY OTHER LOAN PARTY), ARISING OUT OF OR RELATING TO, THE LOAN DOCUMENTS, THE REVOLVING COMMITMENTS, THE USE OR CONTEMPLATED USE OF THE PROCEEDS OF ANY REVOLVING LOANS, OR THE RELATIONSHIP OF ANY LOAN PARTY, THE ADMINISTRATIVE AGENT AND THE LENDERS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT; (C) WITHOUT LIMITING THE FOREGOING, ANY AND ALL CLAIMS, DEMANDS, ACTIONS OR CAUSES OF ACTION, JUDGMENTS AND ORDERS, PENALTIES AND FINES THAT ARE ASSERTED OR IMPOSED AGAINST ANY INDEMNITEE, (I) UNDER THE APPLICATION OF ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES OR ASSETS, INCLUDING THE TREATMENT OR DISPOSAL OF HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES OR ASSETS, (II) AS A RESULT OF THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (III) DUE TO PAST OWNERSHIP BY THE BORROWER OR ANY

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

SUBSIDIARY OF ANY OF THEIR PROPERTIES OR ASSETS OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES OR ASSETS WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (IV) DUE TO THE PRESENCE, USE, STORAGE, TREATMENT OR DISPOSAL OF HAZARDOUS SUBSTANCES ON OR UNDER, OR THE ESCAPE, SEEPAGE, LEAKAGE, SPILLAGE, DISCHARGE, EMISSION OR RELEASE FROM, ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY (INCLUDING ANY LIABILITY ASSERTED OR ARISING UNDER ANY ENVIRONMENTAL LAW), REGARDLESS OF WHETHER CAUSED BY, OR WITHIN THE CONTROL OF, THE BORROWER OR ANY SUBSIDIARY, OR (V) DUE TO ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS; (D) ANY ADMINISTRATIVE OR INVESTIGATIVE PROCEEDING BY ANY GOVERNMENTAL AUTHORITY ARISING OUT OF OR RELATED TO A CLAIM, DEMAND, ACTION OR CAUSE OF ACTION DESCRIBED IN SUBSECTION (A), (B) OR (C) ABOVE; AND (E) ANY AND ALL LIABILITIES (INCLUDING LIABILITIES UNDER INDEMNITIES), LOSSES, COSTS, DAMAGES OR EXPENSES (INCLUDING ATTORNEY COSTS AND SETTLEMENT COSTS) THAT ANY INDEMNITEE SUFFERS OR INCURS AS A RESULT OF THE ASSERTION OF ANY FOREGOING CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR PROCEEDING, OR AS A RESULT OF THE PREPARATION OF ANY DEFENSE IN CONNECTION WITH ANY FOREGOING CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR PROCEEDING, IN ALL CASES, WHETHER OR NOT ARISING OUT OF THE STRICT LIABILITY OR NEGLIGENCE OF AN INDEMNITEE, AND WHETHER OR NOT AN INDEMNITEE IS A PARTY TO SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR PROCEEDING (ALL THE FOREGOING, COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"); PROVIDED THAT NO INDEMNITEE SHALL BE ENTITLED TO INDEMNIFICATION FOR ANY CLAIM TO THE EXTENT CAUSED BY ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  The agreements in this Section shall survive and continue for the benefit of the Indemnitees at all times after the Borrower' acceptance of the Lenders' Revolving Commitments under this Agreement, whether or not the Closing Date shall occur and shall survive the termination of the Revolving Commitments and repayment of all the other Obligations.

**10.06   Payments Set Aside**.   To the extent that the Borrower makes a payment to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with the Chapter 11 Case or any other proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

**10.07   Successors and Assigns**.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent

Tristream East Texas, LLC
DIP Credit Agreement

provided in subsection (d) of this Section and, to the extent expressly provided herein, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Revolving Loans at the time owing to it); *provided that*:

(i)     except in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment and the Revolving Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender with respect to a Lender, the aggregate amount of the Revolving Commitment (which for this purpose includes Revolving Loans outstanding thereunder) or, if the applicable Revolving Commitment is not then in effect, the outstanding principal balance of the Revolving Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "***Trade Date***" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, unless each of the Administrative Agent and, so long as no Default has occurred and is continuing, the Borrower otherwise consents (Borrower's consent not to be unreasonably withheld, conditioned or delayed);

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Revolving Loan or the Revolving Commitment assigned;

(iii)     any assignment of a Revolving Commitment must be approved by the Administrative Agent and, so long as no Event of Default is continuing, the Borrower, unless the Person that is the proposed assignee is itself a Lender (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and

(iv)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Details Form.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of ***Sections 3.07***, ***10.04*** and ***10.05*** with respect to facts and circumstances occurring prior to the effective date of such assignment.   Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

(c)     The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amounts of the Revolving Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or any Loan Party) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitment and/or the Revolving Loans owing to it); *provided that* (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, consent or waiver that would (i) postpone any date upon which any payment of money is scheduled to be paid to such Participant, or (ii) reduce the principal, interest, fees or other amounts payable to such Participant. Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of *Sections 3.01* and *3.04* to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; *provided* said Participant agrees to be subject to *Section 3.08* as though it were a Lender.  To the extent permitted by Law, each Participant also shall be entitled to the benefits of *Section 10.09* as though it were a Lender; *provided* such Participant agrees to be subject to *Section 2.11* as though it were a Lender.

(e)     A Participant shall not be entitled to receive any greater payment under *Section 3.01* or *3.04* than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of *Section 3.01* unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with *Section 3.01* as though it were a Lender.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Revolving Notes, if any) to secure obligations of such Lender to another Lender or Eligible Assignee or to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment threshold specified in clause (i) of the proviso to the first sentence of *Section 10.07(b)*), the Borrower shall be deemed to have given its consent five Business Days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent) unless such consent is expressly refused by the Borrower prior to such fifth Business Day.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**10.08   Confidentiality**.   Each Lender agrees that it will not disclose without the prior consent of the Borrower (other than to directors, officers, employees, auditors, accountants, counsel or other professional advisors of the Administrative Agent or any Lender) any information with respect to the Borrower or any Subsidiary, which is furnished pursuant to this Agreement; *provided* that any Lender may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to or required by any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Lender or submitted to or required by the Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (c) as may be required or appropriate in response to any summons or subpoena in connection with any litigation, (d) in order to comply with any Law, order, regulation or ruling applicable to such Lender, (e) to any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; *provided* that such Eligible Assignee or Participant or prospective Eligible Assignee or Participant executes an agreement containing provisions substantially similar to those contained in this *Section 10.08*, (f) in connection with the exercise of any remedy by such Lender if an Event of Default pertaining to the Loan Documents has occurred and is continuing, (g) in connection with any litigation involving such Lender pertaining to the Loan Documents, (h) to any Lender or the Administrative Agent, or (i) to any Affiliate of any Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and obligated to keep such information confidential).

**10.09   Set-off**.   In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party) to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing by, such Lender to or for the credit or the account of the respective Loan Parties against any and all Obligations due and owing to the Administrative Agent and the Lenders, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender shall have made demand under this Agreement or any other Loan Document.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application.

**10.10   Interest Rate Limitation**.   Regardless of any provision contained in any Loan Document, neither the Administrative Agent nor any Lender shall ever be entitled to contract for, charge, take, reserve, receive, or apply, as interest on all or any part of the Obligations, any amount in excess of the Maximum Rate, and, if any Lender ever does so, then such excess shall be deemed a partial prepayment of principal and treated hereunder as such and any remaining excess shall be refunded to the Borrower.  In determining if the interest paid or payable exceeds the Maximum Rate, the Borrower and the Lenders shall, to the maximum extent permitted under applicable Law, (a) treat all Borrowings as but a single extension of credit (and the Lenders and the Borrower agree that such is the case and that provision herein for multiple Borrowings is for convenience only), (b) characterize any non-principal payment as an expense, fee, or premium rather than as interest, (c) exclude voluntary prepayments and the effects thereof, and (d) amortize, prorate, allocate, and spread the total amount of interest throughout the entire contemplated term of the Obligations.  However, if the Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the Maximum Amount, the Lenders shall refund such excess, and, in such event, the Lenders shall not, to the extent permitted by Law, be subject to any penalties provided by any Laws for contracting for, charging, taking, reserving or receiving interest in excess of the Maximum Amount.

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

**10.11    Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.12    Integration**.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

**10.13    Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Revolving Loan or any other Obligation shall remain unpaid or unsatisfied.

**10.14    Severability**.  Any provision of this Agreement and the other Loan Documents to which the Borrower is a party that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.15    Governing Law**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE; PROVIDED THAT THE ADMINISTRATIVE AGENT AND EACH LENDER SHALL RETAIN ALL RIGHTS ARISING UNDER UNITED STATES FEDERAL LAW.

(b)    BORROWER AND EACH OTHER PARTY HERETO, AND EACH GUARANTOR, BY EXECUTION OF A GUARANTY, AGREES TO THIS *SECTION 10.15(b)*. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF TEXAS SITTING IN THE COUNTY OF HARRIS OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF TEXAS AND APPELLATE COURTS FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, AND BY EXECUTION OF A GUARANTY, EACH GUARANTOR CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.   THE BORROWER, EACH GUARANTOR, THE ADMINISTRATIVE AGENT AND EACH LENDER (1) IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO, AND (2) IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTAGE PREPAID, AT ITS ADDRESS FOR NOTICES DESIGNATED HEREIN.  THE BORROWER, EACH GUARANTOR, THE ADMINISTRATIVE AGENT AND EACH LENDER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

**10.16   Consent to Jurisdiction**BORROWER AND LOAN PARTIES HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND IRREVOCABLY AGREE THAT, SUBJECT TO THE ADMINISTRATIVE AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS  SHALL BE LITIGATED IN SUCH COURTS.   BORROWER AND LOAN PARTIES EXPRESSLY SUBMIT AND CONSENT TO THE JURISDICTION OF THE AFORESAID COURT AND WAIVE ANY DEFENSE OF FORUM NON CONVENIENS.   BORROWER AND LOAN PARTIES HEREBY WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER AND LOAN PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

**10.17   WAIVER OF JURY TRIAL**

**. BORROWER, LOAN PARTIES, ADMINISTRATIVE AGENT AND EACH LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.   BORROWER, LOAN PARTIES, ADMINISTRATIVE AGENT AND EACH LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.   BORROWER, LOAN PARTIES, ADMINISTRATIVE AGENT AND EACH LENDER WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

**10.18   Imaging Loan Documents**.  Each Loan Party and each Lender understands and agrees that (a) Administrative Agent's document retention policy involves the imaging of executed Loan Documents and the destruction of the paper originals, and (b) each Loan Party and each Lender waives any right that it may have to claim that the imaged copies of the Loan Documents are not originals.

**10.19   ENTIRE AGREEMENT**.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[Remainder of this page intentionally left blank.  Signature page follows.]

Tristream East Texas, LLC
DIP Credit Agreement

Error! Unknown document property name.

60

Tristream East Texas, LLC
DIP Credit Agreement

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

TRISTREAM EAST TEXAS, LLC,
a debtor and debtor-in-possession, as Borrower

By: _____
        Gene Waguespack
        [_____]

HADDINGTON ENERGY PARTNERS IV, LP,
as Administrative Agent, Lender

By: _____
Name:
Title:

SCHEDULE 2.01

REVOLVING COMMITMENTS

| Lender | Revolving Commitment from Tenth Amendment Effective Date |
|---|---|
| Haddington Energy Partners IV, LP | $8,000,000 |
| | |
| TOTAL: | $8,000,000 |

Schedule 2.01

**Error! Unknown document property name.**

SCHEDULE 5.06

LITIGATION

None. **[DEBTOR TO UPDATE]**

Schedule 5.08

**Error! Unknown document property name.**

SCHEDULE 5.13

## SUBSIDIARIES AND EQUITY INVESTMENTS **[DEBTOR TO UPDATE]**

PART A: SUBSIDIARIES

None.

PART B: INVESTMENTS

None.

Schedule 5.13

**Error! Unknown document property name.**